STATE OF CONNECTICUT *v.* STEPHEN A. CARTER
(9643)

PETERS, C. J., PARSKEY, SHEA, DANNEHY and SCHALLER, Js.

*(One judge dissenting)*

Argued January 16—decision released April 23, 1985

*Jon C. Blue,* assistant public defender, for the appellant (defendant).

*C. Robert Satti,* state's attorney, with whom, on the brief, was *Michael L. Regan,* assistant state's attorney, for the appellee (state).

SCHALLER, J. The defendant, Stephen A. Carter, was charged by information with robbery in the first degree in violation of General Statutes § 53a-134 (a) (2)[1] and two counts of larceny in the second degree in violation of General Statutes §§ 53a-123 (a) (2) and (a) (1)[2] in con-

---

[1] General Statutes § 53a-134 (a) (2) provides: "(a) A person is guilty of robbery in the first degree when in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon. . . ."

[2] General Statutes (Rev. to 1981) § 53a-123 provides in pertinent part: "(a) A person is guilty of larceny in the second degree when: (1) The property consists of a motor vehicle, (2) the value of the property or service exceeds five hundred dollars . . . ."

In this case, one larceny count under § 53a-123 (a) (2) refers to the theft of approximately $525 from the Gas Land service station. The larceny count under § 53a-123 (a) (1) relates to the theft of a motor vehicle used in connection with the robbery.

nection with a February 23, 1976 theft of a car and robbery of a Gas Land service station in Waterford. He was also charged with attempted robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (2) and larceny in the second degree in violation of General Statutes (Rev. to 1981) § 53a-123 (a) (1) in connection with a March 1, 1976 theft of a car and attempted robbery of a FISCA service station in Waterford. The cases were consolidated for trial. After a trial to the jury, the defendant was found guilty on all counts.

Although the defendant originally appealed from the convictions in both cases, the sole issue presented on appeal is the sufficiency of the evidence connecting the defendant with the Gas Land robbery and car theft.[3] The defendant claims that the trial court erred in denying his motion to set aside the verdict,[4] on the basis that the evidence was insufficient to prove beyond a reasonable doubt that he participated in the Gas Land robbery and larcenies. We do not agree.

In challenging the sufficiency of the evidence supporting his convictions, the defendant acknowledges that, on review, the evidence must be given the construction most favorable to sustaining the jury verdict. He maintains, however, that the verdict must have been based on speculation and that the inferences drawn were not reasonable.

The state claims that the jury could reasonably have concluded that the defendant committed the Gas Land crimes, particularly in light of his accomplice's testimony that the same man assisted in both service station robberies, as well as the inferences that could be drawn from the numerous similarities in the two robberies.

[3] In his brief, the defendant abandoned his challenge of all other issues, including his challenge of the convictions in the FISCA robbery case.

[4] The defendant's motion for a directed verdict was not acted upon.

If we view the evidence in the light most favorable to sustaining the verdict, the jury could reasonably have found the following facts: At the time of the crimes in question, the defendant lived with his wife at 108 Hawthorne Drive, New London. He was a member of the United States Navy, stationed at the submarine base in Groton.

## GAS LAND ROBBERY

On the weekend before Monday, February 23, 1976, the defendant and his wife drove to New York and brought Lawrence Thompson, a long-time friend, and his girlfriend, Athena Osborne, to New London for a visit. The defendant used a car belonging to a shipmate and friend, Thomas Barto. Thompson and the defendant had known each other since childhood, having grown up together in New York City. Thompson visited the defendant about twice a month, usually staying at the defendant's apartment for a few days.

On this occasion, Thompson brought with him a .410 gauge sawed-off shotgun, with a stock on it. The defendant handled the shotgun in his apartment at some time during that weekend. The defendant is about 5′ 5″ in height and weighs approximately 135 to 140 pounds. Thompson is approximately 5′ 11″ in height. Both the defendant and Thompson are black males.

During the afternoon of February 23, 1976, Barto drove Thompson to Two Guys Department Store where Thompson purchased a "slaphammer," a device that can be used to remove ignitions from cars. Thompson told Barto that he was going to use it to steal cars. They returned to the defendant's apartment. When Barto left the apartment, Thompson had the slaphammer. Once in the apartment, Thompson showed the slaphammer to the defendant, who knew what it was used for.

Later that day, several of the defendant's friends were at his apartment, including Michael Harrison, a white shipmate of the defendant, Michael Mueller, another navy friend of the defendant, Thompson, Osborne, and Barto. Barto, who had returned about 5 p.m., left again between 6 and 6:30 with Mueller. When they left, all the others were still there.

On February 23, 1976, between 7:15 p.m. and 7:45 p.m., a brown 1965 Mustang belonging to Paul Vitello, a student at Connecticut College, was stolen from the campus where it had been parked and locked. A coat hanger was used to break into the car; the ignition was removed with the slaphammer, and a screwdriver was used to start the car.

At approximately 8 p.m. that evening a "reddish color" Mustang, later identified as Vitello's, parked at an island in the Gas Land service station located on Route 32 in Waterford. A man emerged from the car, putting a mask over his face, and pulled a shotgun from under his coat. The man was a black male, approximately 5' 10" in height with short hair, wearing a dark blue coat. The man ordered the attendant to go into the back room of the service station and lie face down. The man then took the attendant's wallet and withdrew five dollars. At this point, a second male, the driver of the car, came in and asked the attendant where the money was kept. The attendant indicated that it was in the money box from which the man took approximately $525. After locking the attendant in the back room, the two men left in the Mustang. At approximately 12:30 a.m. on the next day, the Montville police discovered the Vitello vehicle parked with the motor running at a tavern on Route 32 in Uncasville, a short distance from the Gas Land station. When the Montville police returned at 2 a.m., the vehicle was still

there. The Waterford police then had the car towed to the Waterford police department where Vitello identified his car.

### FISCA ROBBERY ATTEMPT[5]

On March 1, 1976, at approximately 8:30 p.m., two men in a black Ford Mustang drive into a FISCA service station located on Route 85 in Waterford. As Barry Bourque, the attendant on duty, approached the car, the driver got out, pulling a mask over his face. The man told Bourque to be quiet and walk toward the building. Bourque called to two friends who were about to leave the station. At this point, a second man emerged from the car, aimed a sawed-off shotgun at Bourque, and told him that he would be "the first to die." About halfway to the building, Bourque grabbed the gun, which then discharged with the bullet striking the service station. The stock of the shotgun, identified as a .410 gauge sawed-off shotgun, broke off when Bourque grabbed the gun. The robber took the stock with him as he fled. Both men left the scene on foot, leaving the car running. One of them dropped a wool cap which he had worn.

When the Waterford police arrived shortly thereafter, Bourque described the men as black males, one approximately 5′ 8″ and the other about 5′ 7″ tall, both weighing between 130 and 140 pounds. When the police searched the area, they found Lawrence Thompson at a nearby intersection. Thompson was taken to the FISCA station where Bourque stated that Thompson's clothes and general description matched those of the men who tried to rob the station.

Thompson was taken to the Waterford police department and lined up with several officers in the hall. A trained police dog that had been exposed to the wool

[5] The facts of the FISCA robbery attempt have already been before this court in *State* v. *Harrison,* 178 Conn. 689, 425 A.2d 111 (1979).

cap left at the scene went up and down the line and stopped in front of Thompson, indicating some contact on his part with the cap. This cap, however, was not the one worn by Thompson the night of the FISCA robbery. He had been wearing a knit cap with holes cut in it, as a mask, whereas the cap dropped at the scene had no eye holes. The cap contained a negroid head hair, as well as some textile fibers having the same characteristics as carpet fibers from the defendant's apartment.

When arrested, Thompson was wearing a jacket bearing a label with the name "Carter," the initials "S.A." and a military identification number assigned to the defendant.

The car used in the robbery had been taken earlier that evening from a commuter parking lot located on Route 85 in Waterford. The car was identified by the owner, Nancy Suchodolski, that same evening at approximately 9:30 p.m. at the Waterford police station. Upon inspection, the owner noticed that the ignition was missing. A coat hanger had been used to break into the vehicle. A screwdriver and a wire which was part of a coat hanger were found on the seat. With the ignition removed, a screwdriver can be used to start a car.

Thomas Barto testified that a couple of days after the FISCA robbery attempt, he had a conversation with the defendant at his apartment. The defendant handed Barto the slaphammer that Thompson had purchased at Two Guys Department Store on February 23, 1976. According to Barto, the defendant asked him to get rid of the slaphammer, saying that the police were looking for it because "it was used to steal a car in a robbery." When questioned as to what robbery the defendant was talking about, Barto replied that he believed the defendant was talking about "the Gas

Land and FISCA.'' When questioned on redirect whether he had previously testified that the defendant had told him about his involvement in these two robberies, Barto answered in the affirmative. Barto also testified that the defendant said that he, Thompson and Harrison had tried to rob the FISCA service station. In the process, the attendant had grabbed the shotgun he was holding and it had gone off.

Lawrence Thompson had pleaded guilty and admitted his involvement in the Gas Land and FISCA crimes. Thompson admitted that he stole the Vitello vehicle and robbed the Gas Land service station on February 23, 1976. Thompson also admitted stealing the Suchodolski vehicle and attempting to rob the FISCA station on March 1, 1976.

When first testifying, Thompson did not wish to disclose the name of the other person actively involved in the Gas Land car theft and robbery. When directed to answer, after first indicating he did not remember, he implicated a David Colbert, a friend from New York, whom he described as 5′ 7″ to 5′ 8″, weighing 160 pounds and having a full beard and a big afro. Colbert supposedly had never been to the defendant's apartment, nor did the defendant know him. Neither Colbert nor anyone by that name could be located using the information supplied by Thompson. Shortly after his arrest, Thompson admitted the FISCA crimes, but said that the Gas Land robbery had been committed by Colbert and a man known as "Little David." He later disavowed that statement.

Michael Harrison was also involved in the crimes. He assisted in the theft of both vehicles. A latent print belonging to Harrison was found on the inside passenger flap window of the car used in the Gas Land robbery.

The defendant saw and handled in his apartment a .410 gauge sawed-off shotgun with a stock on it the weekend Thompson came from New York in Barto's car. The gun used in the robberies looked the same to the defendant as the one Thompson showed him, absent the stock. The defendant admitted that he saw the shotgun used in the FISCA robbery attempt when Thompson brought it from New York and that he had handled the shotgun on March 1, 1976, before Thompson left his apartment.

At first the defendant had denied to the police that the shotgun had ever been in his apartment or that he had handled it. After being told it would be sent to the F.B.I. for prints, he admitted seeing and handling it. He denied being involved in either robbery. He said he never gave Barto the slaphammer, denying even that he knew what a slaphammer was.

The standard that applies when a jury verdict is challenged on the ground of insufficient evidence is well established. "When a verdict is challenged because of insufficient evidence, the issue is whether the jury could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt." *State* v. *Nemeth,* 182 Conn. 403, 410, 438 A.2d 120 (1980); *State* v. *Heinz,* 193 Conn. 612, 625, 480 A.2d 452 (1984); *State* v. *Ruiz,* 171 Conn. 264, 276–77, 368 A.2d 222 (1976). The evidence must be given a construction most favorable to sustaining the jury's verdict. *State* v. *Heinz,* supra; *State* v. *Stepney,* 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984); *State* v. *Nemeth,* supra. It is within the province of the jury to draw reasonable and logical inferences from the facts proven. *State* v. *Williams,* 169 Conn. 322, 336, 363 A.2d 72 (1975). Moreover, the

jury "may base an inference on facts it finds as a result of other inferences." *State* v. *Gabriel,* 192 Conn. 405, 425, 473 A.2d 300 (1984); *State* v. *Gonski,* 155 Conn. 463, 468, 232 A.2d 483 (1967).

It is the trier of fact which determines the credibility of witnesses and the weight to be accorded their testimony. " 'We cannot retry the facts or determine the credibility of the witnesses.' " *State* v. *Penland,* 174 Conn. 153, 157–58, 384 A.2d 356 (1978), cert. denied, 436 U.S. 906, 98 S. Ct. 2237, 56 L. Ed. 2d 404 (1978); see *Johnson* v. *Flammia,* 169 Conn. 491, 497, 363 A.2d 1048 (1975).

"It has long been an established legal principle in this state that the trier of fact has the right to accept part and disregard part of the testimony of a witness." *Raia* v. *Topehius,* 165 Conn. 231, 235, 332 A.2d 93 (1973); *State* v. *Chisolm,* 162 Conn. 631, 632, 295 A.2d 563 (1972). We further recognize that "[j]urors are not 'expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct.' (Citations omitted.)" *State* v. *Scielzo,* 190 Conn. 191, 198 n.11, 460 A.2d 951 (1983), quoting *Frankovitch* v. *Burton,* 185 Conn. 14, 22, 440 A.2d 254 (1981).

We note, as we begin our analysis, that the only issue before us is the sufficiency of evidence supporting the jury determination that Carter participated with Thompson in the Gas Land crimes. The defendant does not challenge the sufficiency of evidence establishing that the Gas Land and FISCA crimes were committed, nor does he challenge the jury decision that he committed the FISCA crimes with Thompson.

It is obvious from the guilty verdicts in the FISCA case that the jury rejected both Thompson's explana-

tion that the second active participant was David Colbert and the defendant's claim that he did not participate in either robbery. The jury verdicts reveal a conclusion by the jury that the same person assisted Thompson in both incidents, that person being the defendant, not David Colbert. Contrary to the defendant's argument that such a conclusion must be illogical as requiring the jury to believe and disbelieve the same evidence, we find no such inconsistency. To reach its conclusion, the jury merely accepted Thompson's testimony to the effect that the same person participated in both the FISCA and Gas Land robberies, while rejecting his version exonerating the defendant. The trier of fact has that power, in discharging its responsibility as the final judge of credibility. *Raia* v. *Topehius,* supra, 235.

From the evidence in the case, the jury had a nucleus of direct evidence from which it could draw reasonable inferences supporting its conclusion that the defendant committed the Gas Land crimes with Thompson. The defendant had driven to New York on the weekend before the February 23 Gas Land robbery, bringing Thompson to his apartment. Thompson had the shotgun which he used in both robberies. The defendant handled the gun that weekend. Accompanied by Barto, Thompson purchased the slaphammer used in the car thefts. He brought it back to the defendant's apartment, where he showed it to the defendant, who already knew what it was used for. Between 5 p.m. and 6:30 p.m. on the day of the robbery, Harrison, a participant in the Gas Land and FISCA car thefts, was at the defendant's apartment along with Thompson. The Vitello car theft occurred between 7:15 and 7:45 p.m. that same evening. Thompson, wearing the defendant's clothes, committed the Gas Land robbery, with a black male accomplice meeting the defendant's general

description. After the robbery, Thompson returned to the defendant's apartment.

After the FISCA robbery, the defendant asked Barto to get rid of the slaphammer, which he had in his apartment, because it had been used in two robberies.

The jury further heard testimony that the individual named as the second participant in both robberies, a David Colbert, could not be located where Thompson said he could be found. His description varied in material respects from that of the second participant in the Gas Land robbery. Clearly, the jury, appropriately exercising its power, credited Thompson's testimony that the same person was involved in both robberies, but concluded that the person was Carter.

Beyond that nucleus of direct evidence, the jury had substantial evidence of a host of similarities between the FISCA crimes and the Gas Land crimes.

"Evidence of other misconduct, although not ordinarily admissible to prove the bad character or criminal tendencies of the accused, may be allowed for the purpose of proving many different things, such as intent, identity, malice, motive or a system of criminal activity." *State* v. *Shindell,* 195 Conn. 128, 133, 486 A.2d 637 (1985), quoting *State* v. *Ibraimov,* 187 Conn. 348, 352, 446 A.2d 382 (1982); *State* v. *Braman,* 191 Conn. 670, 675–76, 469 A.2d 760 (1983); *State* v. *Falby,* 187 Conn. 6, 23, 444 A.2d 213 (1982). The methods used must be "sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other." *State* v. *Ibraimov,* supra, 354; *State* v. *Braman,* supra, 681.

This evidence of similarities in the two incidents allowed the jury to infer that the defendant participated in the Gas Land crimes. Both incidents involved the same sequence of events occurring on Monday even-

ings at approximately the same time. In both cases a parked, locked Mustang was stolen, by the same method, consisting of entry with a coat hanger, removal of the ignition with a slaphammer and starting with a screwdriver. In both cases, the Mustangs were stolen shortly before the robberies from locations close to the service stations.

The targets of both robberies were convenience gas stations, located in Waterford, approximately equal distances from the defendant's home. Lawrence Thompson was involved in both cases. On both occasions he wore Carter's clothing over his own. He was accompanied by a black male in both cases. Both times the driver got out of the car first when the attendant came out of the station building and the passenger followed. Both times, Thompson's sawed-off shotgun was used. Both robbers wore masks during both robberies. Michael Harrison, who had been at Carter's apartment on the day of the Gas Land crimes, participated in both car thefts.

The jury, thus, had Thompson's testimony that a black male named David Colbert committed both robberies with him, together with its own unassailed conclusion, that the defendant, not Colbert, committed the FISCA robbery. It could give significant weight to Barto's testimony concerning the robberies and the slaphammer. Additionally, the jury had direct evidence of the defendant's contacts with various aspects of the Gas Land crimes, including contacts with Thompson, Harrison, the shotgun, the slaphammer, the cap and the clothing worn by Thompson.

Beyond that, it could consider the defendant's own misstatements and changes in his statements to the police as consciousness of his guilt. *State* v. *Banks,* 194 Conn. 617, 621–22, 484 A.2d 444 (1984); *State* v. *DeMatteo,* 186 Conn. 696, 702, 443 A.2d 915 (1982).

From the cumulative effect of the evidence, together with reasonable inferences, the jury could reasonably have concluded, beyond a reasonable doubt, that the defendant was the active participant with Thompson in the Gas Land crimes, as well as the FISCA crimes. *State* v. *Little,* 194 Conn. 665, 673, 485 A.2d 913 (1984); *State* v. *Banks,* supra, 621; *State* v. *Ruiz,* 171 Conn. 264, 276–77, 368 A.2d 222 (1976). "As the United States Supreme Court has said, in cases dealing with circumstantial evidence, as well as testimonial evidence, 'a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. [T]he jury must use its experience with people and events in weighing the probabilities. If the jury is convinced [of a defendant's guilt] beyond a reasonable doubt, we can require no more.' *Holland* v. *United States,* 348 U.S. 121, 140, 75 S. Ct. 127, 99 L. Ed. 150 (1954)." *State* v. *Morrill,* 193 Conn. 602, 612, 478 A.2d 994 (1984).

In this case, we are convinced from a review of the evidence that there was sufficient evidence to support the jury's verdict; the crimes charged were proven beyond a reasonable doubt.

There is no error.

In this opinion PETERS, C. J., PARSKEY and DANNEHY, Js., concurred.

SHEA, J., dissenting. I disagree with the majority opinion that finds sufficient evidence to support the defendant's conviction of the charges relating to the robbery of the Gas Land service station in Waterford on February 23, 1976.

The evidence principally relied upon by the majority, as well as the state, may be classified as follows: (1) testimony of his friend Lawrence Thompson, claimed to implicate the defendant in the Gas Land rob-

bery; (2) similarities in the modus operandi used in both the Gas Land crime and the FISCA attempted robbery, for which the defendant's guilt is not questioned on appeal; and (3) admissions of the defendant made in his conversation with another of his friends, Thomas Barto.

Thompson, who had pleaded guilty to both the Gas Land and FISCA crimes, testified that he committed both crimes in the company of David Colbert, a long-time friend from New York, where Thompson also resided. He denied that the defendant was involved in either offense. The majority opinion contends that, since the jury found upon sufficient evidence that the defendant, not Colbert, was Thompson's accomplice in the FISCA robbery attempt, it can reasonably be inferred that the defendant, not Colbert, also participated with Thompson in the Gas Land robbery, because in both instances Thompson named the same person as his companion. It is clear, of course, that the jury had the right to disbelieve Thompson's testimony and did so. We have frequently held, however, that a trier cannot make an affirmative factual finding from testimony that has obviously been rejected. *State* v. *Mayell,* 163 Conn. 419, 426–27, 311 A.2d 60 (1972); *Marquis* v. *Drost,* 155 Conn. 327, 332, 231 A.2d 527 (1967); *Panicali* v. *Connecticut State Board of Labor Relations,* 147 Conn. 344, 348, 160 A.2d 903 (1960). "While it would be within the province and right of the trial court to discredit and reject all or part of [a witness'] testimony or to adopt, as true, one of two or more conflicting statements made by him, this privilege does not extend to the finding of a fact, contrary to that to which he testified . . . ." *Meagher* v. *Colonial Homes Co.,* 109 Conn. 343, 347–48, 146 A. 609 (1929). " 'Facts cannot be established by not believing witnesses who deny them.' *Beers* v. *Prouty & Co.,* 203 Mass. 254, 257, 89 N.E. 557 [1909] . . . . " *State* v. *Poplowski,* 104

Conn. 493, 495, 133 A. 671 (1926). These principles are clearly violated by the majority's reliance upon Thompson's testimony that it was Colbert, not the defendant, who participated with him in both crimes as support for the defendant's conviction in the Gas Land robbery.

The similarities in the two crimes that are also relied upon by the majority are readily explained by the fact that Thompson admittedly participated in both and appears to have been the dominant personality. There are no distinctive features common to both crimes that implicate the defendant in the Gas Land robbery. Under these circumstances the similarity of the modus operandi used in both offenses lends no support to the inference that, because the defendant participated in the FISCA incident, he also joined in the Gas Land robbery.

The remaining evidence relied upon by the majority consists largely of the testimony of Thomas Barto concerning his conversation with the defendant a few days after the FISCA robbery attempt. The defendant's request that Barto get rid of the slaphammer, because "it had been used to steal a car in a robbery," which Barto assumed referred to "the Gas Land and FISCA," indicates at most some knowledge of the Gas Land robbery on the part of the defendant, but not his participation in that crime. It cannot be assumed from the defendant's desire to dispose of the slaphammer after the FISCA affair, in which he had accompanied Thompson, that he had also been Thompson's companion in the Gas Land crime. Barto on direct examination by the state testified that he could not recall what the defendant had said about Gas Land.[1] The affirmative answer Barto gave on redirect examination to the question, "Mr. Carter told you about these—about his involvement in these two robberies on that afternoon,

---

[1] Barto testified as follows about his conversation with the defendant a few days after the FISCA attempted robbery on March 1, 1976:

"Q. And do you recall what was said?

was that your testimony?" viewed in the light of his previous testimony of inability to recall the conversation about Gas Land, is at best ambiguous. It certainly cannot be construed as an admission by the defendant that he was involved as a participant in both crimes, as the majority opinion assumes. A finding of guilt in a criminal case can hardly rest upon such a slender reed.

The other evidence cited in the opinion, the defendant's association with Thompson, who had stayed at his apartment, his handling of the shotgun in the apartment about the time of the Gas Land robbery, his knowledge that Thompson had bought a slaphammer and that such a device could be used for stealing cars, falls far short of indicating that the defendant engaged in the Gas Land crime. The inconsistencies in his statements to the police, which the majority rely upon as "consciousness of guilt," are explicable on the basis of his guilt of only the FISCA attempted robbery. They justify no inference of his participation in the Gas Land crime.

"To warrant a judgment of guilty the evidence must be such as to establish the guilt of the accused beyond a reasonable doubt, and any conclusion, reasonably to be drawn from the evidence, which is consistent with the innocence of the accused, must prevail." *State* v. *Guilfoyle,* 109 Conn. 124, 139, 145 A. 761 (1929). The conclusion of the majority upholding the defendant's conviction of the Gas Land robbery cannot, in my judgment, be reconciled with that standard. Accordingly, I dissent.

---

"A. About the Gas Land, I don't remember.

"Mr. Wilensky: I'm sorry. I didn't get the last part.

"The Court: Read it back. Sir, keep your voice up, please, Read it back.
(Answer read by reporter.)

"By Mr. Hurley:

"Q. Did you say you did have a conversation with Mr. Carter but you don't remember what was said about it, is that correct?

"A. Yes."