IN RE ROBERT H.█
(12516)

IN RE RICHARD C.█
(12517)

IN RE BLAIR P.█
(12540)

HEALEY, SHEA, DANNEHY, SANTANIELLO and CALLAHAN, Js.

694

Argued January 16—decision released May 20, 1986

*Joseph Dimyan,* with whom, on the brief, were *Robert V. Cimmino* and *Catherine A. Rivard,* for the appellants in No. 12516 and No. 12517 (juveniles).

*Donald A. Mitchell,* for the appellant in No. 12540 (juvenile).

*John H. Kearney,* court advocate, for the appellee (state).

ARTHUR H. HEALEY, J. The principal issue on this appeal is whether the trial court erred in granting the motion to quash the three respondents' subpoena that sought records from a sexual assault counselor who assisted the victim at a rape crisis center because of the statutory privilege accorded by General Statutes § 52-146k. The respondents Robert H. and Richard C. additionally raise the issue of whether there was sufficient evidence of intent to prove they had violated General Statutes §§ 53a-70 and 53a-8. The respondent Blair P. also raises two issues: (1) whether he was adjudged

delinquent without sufficient evidence and without required findings; and (2) whether the trial court made a disposition of him without the required findings under General Statutes § 46b-140 (b).

This case arises out of an adjudication of delinquency and a commitment of the respondents, Blair, Richard and Robert, to the custody of the department of children and youth services (DCYS) for a period not to exceed one year. The three juveniles, all fourteen or fifteen years old,[1] were adjudicated delinquent on the charge of sexual assault in the first degree in violation of General Statutes § 53a-70.[2] This appeal followed.[3]

The three juveniles entered denials to the charges and a joint adjudication hearing was held before the trial court, *Maiocco, J.* The evidence adduced at the hearing included the following: The fourteen year old victim, T, and two friends, Mary Ann and Kristi, were at the apartment of Mary Ann's parents in the afternoon on January 15, 1984. While at the apartment, Mary Ann's brother, the respondent Richard, and the other two respondents, Blair and Robert, arrived as did two other girls, Kim and Brenda. The victim testified that they listened to records and danced in the living room. Mary Ann and Brenda testified that T was "grabbing" the "private parts" and buttocks of Richard and Blair. Kim and Brenda left during the course of the afternoon. The victim testified that Blair and she

[1] The respondents, all under the age of sixteen at the time of the offense, are considered "children" whose offenses are treated as "juvenile matters." General Statutes §§ 46b-120, 46b-121.

[2] General Statutes § 53a-70 (a) provides: "A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

[3] The record in this appeal has been combined for all three respondents and a motion by Robert and Richard to combine their appeals Docket Nos. 12516 and 12517, and to file one brief had been granted.

were in Mary Ann's bedroom and that "Blair wanted to fool around and stuff like that and I wasn't willing." At this point, Richard and Robert entered the room and helped Blair remove T's pants and hide them. T said she was "kicking and screaming for Mary Ann and Kristi" but that they did not respond. Either Richard or Robert came into the room and helped Blair in his attempt to keep T's legs apart. Blair then inserted his finger into T's vagina. A detective, however, who was one of the officers assigned to investigate the incident, testified that a written statement taken from T on the night of the assault in the hospital stated: "[Blair] kissed me, touched my breasts, and he put his fingers in my vagina." T, however, testified that this first incident of sexual activity occurred while she was "resisting" and "kicking." Because she still refused Blair's advances, T testified, Blair called Robert and Richard into the room and Robert squirted baby oil on her. She put on a robe and started to go into another bedroom to clean herself in an adjoining bathroom. At this point, she was pulled down onto the bed. When the lights were turned on, she saw the three respondents standing there. The telephone rang and Blair left the room. T sat up and she yelled to Kristi that if it was her father on the phone to relay the message that she had already left "because [she] figured that they'd let [her] go because they might have thought [her] dad would come looking for [her]." Blair walked into the room carrying a broom. Robert was holding the victim's feet and Richard was holding her arms. Blair then pushed the broom "very hard" into her vagina. The juveniles then returned her pants. She dressed, left the apartment and walked home. She telephoned Mary Ann when she reached her home because she was in "a lot of pain." She told her mother "what happened" and her parents took her to the hospital where she had to undergo an operation for an injury received during the second incident of intercourse.

Three of the girls who were at the apartment testified that they did not hear T scream, yell, or call out, during the time that T was in the bedroom with Blair. Mary Ann and Kristi testified that they each saw Blair in the kitchen holding a broom. Mary Ann also testified that before "everybody had went into that room with [T]" she saw Blair in the kitchen "wiping [the broomstick] with a napkin."

The trial court made several findings. The court determined that "the over-all attitude prevailing in the [apartment] the afternoon of January [15], 1984, was one of frivolity and sexual expressions, especially as it involved [T] and the three Respondents. . . . It is also clear that all three boys participated in the events that occurred in the bedroom of [Richard's mother]. The Court can also be reasonably satisfied that [T] continued to be a willing participant, continuing against feigned protestations. Granting all that counsel has said in defense as being true up to this point, granting that she was willing up to this point, the Court still feels that until [sic] the introduction of the broom into the scene that the complexion and atmosphere completely changed. . . . The Court does find that the testimony of [T] in this respect is credible and, as it relates to [Blair], is sufficient to establish beyond a reasonable doubt that he did penetrate the vagina of [T] with a broom without her consent and by use of force in the nature of assistance of [Robert] and [Richard] and their physically restraining her and holding her down while the act was consummated." The trial court specifically acknowledged that defense counsel "thoroughly and exhaustively cross-examined [T] on claimed inaccuracies in the Court testimony as compared to written statements attributed to her and marked in Evidence." Nevertheless, "[s]uffice to say that the Court has reflected on her in-Court testimony and found that it was consistent throughout. Further, close examination

of the claimed inconsistencies between in-Court testimony and her written statements show that they are more in the nature of amplifications, qualifications or explanations of the written statements and not truly inconsistencies."

The respondents claim that it was because of "yet other inconsistent statements made by" T that they sought to introduce the records from the rape crisis center. The respondents[4] issued a subpoena duces tecum to Debbie Kemlage of the Women's Center of Greater Danbury. An attorney for the center filed a motion to quash the subpoena because of the testimonial privilege created by Public Acts 1983, No. 83-429, now General Statutes § 52-146k.[5] The respondents'

---

[4] The subpoena duces tecum was issued by counsel on behalf of his client, Robert H., but as the court and defense counsel noted the other defendants were "acting in concert" for the production of the records and all objections and exceptions taken by one attorney were joined by the other two attorneys.

[5] General Statutes § 52-146k provides: "(a) As used in this section . . . "(3) 'Confidential communication' means information transmitted between a victim of a battering or a sexual assault and a battered women's counselor or sexual assault counselor in the course of that relationship and in confidence by a means which, so far as the victim is aware, does not disclose the information to a third person other than any person who is present to further the interests of the victim in the consultation or any person to whom disclosure is reasonably necessary for the transmission of the information or for the accomplishment of the purposes for which such counselor is consulted, and includes all information received by, and any advice, report or working paper given or made by, such counselor in the course of the relationship with the victim.

"(4) 'Rape crisis center' means any office, institution or center offering assistance to victims of sexual assault and their families through crisis intervention, medical and legal advocacy and follow-up counseling and which meets the department of health services criteria of service provision for such centers.

"(5) 'Sexual assault counselor' means any person engaged in a rape crisis center who (A) has undergone a minimum of twenty hours of training which shall include, but not be limited to, the dynamics of sexual assault and incest, crisis intervention, communication skills, working with diverse populations, an overview of the state criminal justice system, information about hospital and medical systems and information about state and com-

offer of proof was that the evidence sought from the center's records would show that there were "substantial inconsistencies" in T's testimony and that T was "coached in her testimony." In support of their subpoena, the respondents cited the state and federal constitutions, specifically the fifth and fourteenth amendment rights to due process and the sixth amend-

---

munity resources for sexual assault victims, (B) is certified as a counselor by the sexual assault center which has provided such training, (C) is under the control of a direct services supervisor of a rape crisis center, and (D) whose primary purpose is the rendering of advice, counseling and assistance to, and the advocacy of the cause of, victims of sexual assault.

"(6) 'Victim' means any person who consults a battered women's counselor or a sexual assault counselor for the purpose of securing advice, counseling or assistance concerning a mental, physical or emotional condition caused by a battering or a sexual assault.

"(b) A battered women's counselor or a sexual assault counselor shall not disclose any confidential communications made to such counselor by a victim in any civil or criminal case or proceeding or in any legislative or administrative proceeding unless the victim making the confidential communications waives the privilege, provided under no circumstances shall the location of the battered women's center or rape crisis center or the identity of the battered women's counselor or sexual assault counselor be disclosed in any civil or criminal proceeding.

"(c) When a victim is deceased or has been adjudged incompetent by a court of competent jurisdiction, the guardian of the victim or the executor or administrator of the estate of the victim may waive the privilege established by this section.

"(d) A minor may knowingly waive the privilege established by this section. In any instance where the minor is, in the opinion of the court, incapable of knowingly waiving the privilege, the parent or guardian of the minor may waive the privilege on behalf of the minor, provided such parent or guardian is not the defendant and does not have a relationship with the defendant such that he has an interest in the outcome of the proceeding.

"(e) The privilege established by this section shall not apply: (1) In matters of proof concerning chain of custody of evidence; (2) in matters of proof concerning the physical appearance of the victim at the time of the injury; or (3) where the battered women's counselor or sexual assault counselor has knowledge that the victim has given perjured testimony and the defendant or the state has made an offer of proof that perjury may have been committed.

"(f) The failure of any party to testify as a witness pursuant to the provisions of this section shall not result in an inference unfavorable to the state's cause or to the cause of the defendant."

ment right to compulsory process to the federal constitution and the due process clause of article first, § 8, of the state constitution. The respondents stated that the privilege claimed by the counselor was only a legislative enactment and that it "must of necessity fall in lieu of the Federal and State constitutions." The respondents also requested proof that the center and the counselor had met the requirements of the statute before asserting the privilege. The attorney for the center informed the court that the supervisor of the rape crisis center, who would be able to testify and present the necessary documents to qualify the center under the statute, was unavailable. The court continued the hearing on the motion to quash until the next week and the center's attorney withdrew the motion to quash at that time.

On March 20, 1984, the court resumed the hearing and the center's attorney again moved to quash the subpoena. The center called as its first witness Susan Jamison, the coordinator of the rape crisis center, and offered testimony for the purpose of qualifying the center and its counselors, under General Statutes § 52-146k, on such subjects as training, services and the purpose of the center. The defense sought to question Jamison as to whether she was the individual who counseled T. The attorney for the center objected, stating that the identity of the counselor could not be divulged under the statute. Defense counsel then argued that that portion of the statute that requires the privileged statements to have been given to a "properly qualified counselor" could not be established. The trial court agreed, calling it a "Catch 22" situation, and "the type of Public Act that needs more work" because "just to get to the point as to whether or not an exception exists, the very information that the statute indicates should not be divulged would almost seem to be absolutely necessary to know whether that exception

exists." Nevertheless, the court sustained the objection to the question as to the identity of the counselor. The trial court found that the records fell within the statutory privilege and that the blanket prohibition of the statute precluded the respondents' review of the records. The court found that the rape crisis center and its files qualified under the statute and that the defense did not make a showing that one of the exceptions in § 52-146k (e) applied and therefore granted the motion to quash. The respondents took exceptions to the trial court's ruling. On appeal, the respondents claim that the privilege was improperly invoked because none of the definitional elements could be established with respect to the counselor who received communications from T and because it violated their constitutional rights.

We agree with the respondents that if the identity of the sexual assault counselor cannot be disclosed under General Statutes § 52-146k (b), then it would always be impossible to determine whether the statutory criteria set out in § 52-146k (a) (5) were satisfied with respect to that sexual assault counselor. The conflict arises between § 52-146k (b), which prohibits the disclosure of the identity of that counselor "in any civil or criminal case," and § 52-146k (a) (5), which sets forth the criteria which must be satisfied by such a sexual assault counselor in order to qualify for the privilege under the statute, the existence of which is the dominant purpose of the statute. Whatever may be said to have been the legislative purpose for absolutely prohibiting the identity of a "battered women's counselor," the legislature did, in § 52-146k (b), extend that prohibition to sexual assault counselors[6] as well.

---

[6] We realize that ordinarily the testimony of witnesses appearing before legislative committees is " 'not admissible in proof of a legislative intention in an Act passed by the body, for the reason that it is impossible to determine what effect the individual discussion had upon the action taken.'

The legislature, as noted, set forth criteria that a sexual assault counselor must fulfill in order to qualify the communications from a "victim," as defined in § 52-146k (a), as confidential under the privilege the statute creates. Unfortunately, the legislature has created by the plain language of the statute a situation that imposes a condition precedent to the very invocation of the privilege which is impossible of fulfillment because of the identity proviso in § 52-146k (b). We do not believe that the legislature intended such a result given the dominant intent of § 52-146k to create a privilege. On the one hand, the language of § 52-146k (b) disables the successful invocation of the privilege because the statute prohibits the disclosure of the identity of the sexual assault counselor who counseled the victim to prove qualification under § 52-146k (a) (5). On the other hand, one in the position of the respondents would never be able to demonstrate that the privilege should not be permitted to be invoked because the identity bar of § 52-146k (b) would prevent them from determining whether that counselor had *not* satisfied the criteria set out in § 52-146 (a) (5).[7]

---

*Hartford* v. *Connecticut Co.*, 107 Conn. 312, 341, 140 A. 734 [1928]; *Baker* v. *Norwalk*, 152 Conn. 312, 316, 206 A.2d 428 [1965]." *Charlton Press, Inc.* v. *Sullivan*, 153 Conn. 103, 111, 214 A.2d 354 (1965). While not influential in our determination of this issue, we do note that testimony to the judiciary committee from Charlotte Kinlock, coordinator of the Connecticut Task Force on Abused Women indicated that various incidents involving battered women prompted the need for this provision in the bill so that "shelter workers will no longer have to rely on luck to avoid being injured or killed" and "will have the security of knowing that tomorrow they cannot be subpoenaed into court and suddenly be 10 feet from a batterer . . . who, up until that point, did not know what the shelter worker's name was, or what she looked like, or where the shelter was located."

[7] The concurring opinion suggests that we have "effectively emasculated the statutory privilege for protection of the identity of the rape crisis counselor." The statutory privilege, however, is for the protection of the confidentiality of communications made by a victim to a statutorily qualified sexual assault counselor. The statutory prohibition on the disclosure of the counselor's identity effectively emasculates the defendant's constitutional

We approach this issue keeping in mind that "[i]t is a cardinal rule of statutory construction that a statute is not to be construed so as to thwart its purpose." *Narel* v. *Liburdi,* 185 Conn. 562, 571, 441 A.2d 177 (1981), cert. denied, 456 U.S. 928, 102 S. Ct. 1974, 72 L. Ed. 2d 443 (1982); see *Evening Sentinel* v. *National Organization for Women,* 168 Conn. 26, 31, 357 A.2d 498 (1975). The obvious intent and the dominant purpose of this statute is to grant a privilege to confidential communications between a sexual assault counselor or a battered women's counselor and a victim. 26 S. Proc., Pt. 11, 1983 Sess., pp. 3783–84, and 26 H.R. Proc., Pt. 15, 1983 Sess., pp. 5279–85. Incident to that purpose was, it was fair to say, an intention to protect or keep anonymous the identity of counselors who might be sought to testify "in any civil or criminal proceeding." Although such protections are certainly commendable, it is apparent that the identity proviso in § 52-146k (b) would thwart the dominant purpose and obvious intent in creating a privilege in the first place. The rule now generally approved is that a proviso which is directly repugnant to the purview or body of the act is inoperative and void for repugnancy. See, e.g., *American Can Co.* v. *McCanless,* 193 S.W.2d 86 (Tenn. 1946); *State* v. *Nielson,* 19 Utah 2d 66–68, 426 P.2d 13 (1967); *Bence* v. *Milwaukee,* 84 Wis. 2d 224, 233, 267 N.W.2d 25 (1978); 73 Am. Jur. 2d, Statutes § 321.

Under General Statutes § 1-3, "[i]f any provisions of any act passed by the general assembly or its application to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of such act." See *State* v. *Menillo,* 171 Conn. 141, 145–46, 368 A.2d 136 (1976). "To hold that legislation is valid as to one part and invalid as to another

right to cross-examination of the interviewing counselor on her statutorily prescribed qualifications which are threshold to the proper invocation of the very privilege that the statute creates.

is not anomalous but consonant with principles long established." *Amsel* v. *Brooks,* 141 Conn. 288, 300, 106 A.2d 152, appeal dismissed, 348 U.S. 880, 75 S. Ct. 125, 99 L. Ed. 693 (1954). "The principle of separability is in aid of the intention of the lawgiver." *Angermeier* v. *Sea Girt,* 27 N.J. 298, 311, 142 A.2d 624 (1958). We determine that that portion of § 52-146k (b) which prohibits the disclosure of the identity of a sexual assault counselor is separable and independent from the balance of the statute given its dominant purpose of creating the privilege and designed, as it is, to effectuate that privilege. See *Seals* v. *Hickey,* 186 Conn. 337, 353–54, 441 A.2d 604 (1982). We believe that the balance of the statute, apart from the offending portion, may be executed to discharge such legislative intent. In so doing, we continue to recognize, as we must, that " 'statutes are to be construed to give effect to the apparent intention of the lawmaking body.' *Robinson* v. *Unemployment Security Board of Review,* 181 Conn. 1, 6, 434 A.2d 293 (1980); see *Verrastro* v. *Sivertsen,* [188 Conn. 213, 220, 448 A.2d 1344 (1982)]; 2A Sutherland, Statutory Construction (4th Ed. Sands 1984) § 45.05." *Peck* v. *Jacquemin,* 196 Conn. 53, 65, 491 A.2d 1043 (1985). The United States Supreme Court has said that even with the presumption of divisibility, "we cannot rewrite a statute and give it an effect altogether different from that sought by the measure viewed as a whole" especially where offending portions "so affect the dominant aim of the whole statute as to carry [the whole statute] down with them." *Railroad Retirement Board* v. *Alton Railroad Co.,* 295 U.S. 330, 362, 55 S. Ct. 758, 79 L. Ed. 1468 (1935). This, fortunately, is not the case in this highly appropriate statute which encompasses a socially desirable plan.

We remand this case to the trial court, *Maiocco, J.,* for, inter alia, a determination of whether the sexual assault counselor who treated this victim has satisfied

the criteria of § 52-146k (a) (5). The counselor's identity must now be disclosed to the respondents in order to allow them to cross-examine the counselor only as to her statutory qualifications under § 52-146k (a) (5), presumably demonstrated during her direct examination.

The respondents also claim that because the outcome of the case turned on the credibility of T, the records of the rape crisis center would have been relevant and material to the defense and to deny them access to the records is to deny them their right to confrontation, the right to due process, the right to compulsory process and the right to present a defense.

A criminal defendant has the "right to confront and to cross-examine one's accusers, guaranteed in a state trial through the sixth and fourteenth amendments to the United States constitution; *Pointer* v. *Texas,* 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); see *State* v. *Bugbee,* 161 Conn. 531, 534, 290 A.2d 332 (1971). . . . " *State* v. *Festo,* 181 Conn. 254, 267, 435 A.2d 38 (1980). The defendants' rights do not, however, encompass the right to present irrelevant, immaterial or prejudicial evidence. See *Haber* v. *Wainwright,* 756 F.2d 1520, 1522–23 (11th Cir. 1985). Moreover, the defendants' right to confront and to cross-examine witnesses against them is not absolute, but must, on occasion, bow to other legitimate interests in the criminal trial process. *Chambers* v. *Mississippi,* 410 U.S. 284, 295, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); see *State* v. *Festo,* supra, 268; *State* v. *Mastropetre,* 175 Conn. 512, 521, 400 A.2d 276 (1978). The court advocate claims that the respondents' right to confrontation, particularly as to the rape crisis counselor, must bow to the legitimate interest established by General Statutes § 52-146k and in support cites subsection (f): "The failure of any party to testify as a witness pursuant to the

provisions of this section shall not result in an inference unfavorable to the state's cause or to the cause of the defendant.''

The legislature, by enacting General Statutes § 52-146k, provided a privilege to the confidential communications of a victim of sexual assault to a rape crisis counselor. The privilege may not be invoked by the counselor in three specific circumstances, including when there is an offer of proof that perjury may have been committed. General Statutes § 52-146k (e). The legislative history reveals that the privilege was intended to be akin to the psychiatrist-patient privilege. General Statutes § 52-146d; see 26 H.R. Proc., Pt. 15, 1983 Sess., pp. 5284–85. The purpose of both the victim-sexual assault counselor privilege and the psychiatrist-patient privilege is to enable a victim or patient to enter into a therapeutic, healing relationship with a trained counselor and to disclose highly personal confidences and information with the expectation that it will not be divulged except when waived under the statute. The victim-counselor relationship is one that society and the legislature has chosen to recognize as promoting a needed treatment process. The issue before us then becomes whether it is necessary to alter the claimed absolute statutory privilege of the victim in order to permit the respondents their constitutional right to confront the witness and cross-examine her about material in her records.

It should be noted that each of the respondents' attorneys at the adjudication hearing extensively and effectively cross-examined the victim, T. The respondents, nevertheless, argue that although their cross-examination of the victim revealed some inconsistent statements, the additional inconsistent statements sought in the records would not be merely cumulative. The thrust of their argument is that the quashing of the subpoena was error because it denied them their

right to cross-examination, their right to a fair hearing and the right to present witnesses in their favor. "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Washington* v. *Texas,* 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967).

The victim's testimony was crucial to the state's case. As in many sexual assault cases, the victim is the only witness to the crime. Her credibility was, therefore, important. The statements made to the sexual assault counselor, if introduced at the hearing, may or may not have impacted greatly, or at all, on her credibility. The respondents claim that because the court chose to disbelieve the victim's testimony as to her unwillingness to engage in the first instance of vaginal penetration and yet chose to believe her testimony as to the circumstances surrounding the second instance of vaginal penetration involving the broomstick, it demonstrates how "central and crucial the credibility issue was to the adjudication."

As in *Davis* v. *Alaska,* 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974), the conflict between the respondent's right to cross-examine an important witness and a statutory privilege designed to protect that same witness must be resolved. In *Davis* v. *Alaska,* supra, a state statute prevented the defendant from revealing to the trier the witness' probationary status resulting from a juvenile delinquency adjudication. The United States Supreme Court held that the defendant

had been denied his right of effective cross-examination because the witness' possible bias due to his probationary status was unable to be revealed to the jury. The court held that the state's policy interest in protecting juvenile offenders' confidentiality must yield to the defendant's constitutional right of confrontation. Id., 320.

In *State* v. *Bruno,* 197 Conn. 326, 497 A.2d 758 (1985), and *State* v. *Esposito,* 192 Conn. 166, 471 A.2d 949 (1984), we considered the question of when a trial court or a criminal defendant should be permitted to examine psychiatric records of a state's witness to determine whether there was relevant impeaching evidence in light of the statutory psychiatric-patient privilege of General Statutes § 52-146e. In both cases the trial court refused to conduct an in camera inspection of the records because it determined that the statutory privilege protecting the confidentiality of the records precluded it from doing so. In *State* v. *Esposito,* supra, we enunciated a procedure, approved in *State* v. *Bruno,* "which would protect the witness' statutory right to confidentiality while simultaneously safeguarding the defendant's constitutional right effectively to cross-examine the witness." *State* v. *Bruno,* supra, 329. That procedure is as follows: "If . . . the claimed impeaching information is privileged there must be a showing that there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken. Upon such a showing the court may then afford the state an opportunity to secure the consent of the witness for the court to conduct an in camera inspection of the claimed information and, if necessary, to turn over to the defendant any relevant material for the purposes of cross-examination. If the defendant does make such showing and such consent is not forthcoming then the

court may be obliged to strike the testimony of the witness. If the consent is limited to an in camera inspection and such inspection, in the opinion of the trial judge, does not disclose relevant material then the resealed record is to be made available for inspection on appellate review. If the in camera inspection does reveal relevant material then the witness should be given an opportunity to decide whether to consent to release of such material to the defendant or to face having her testimony stricken in the event of refusal." *State* v. *Esposito,* supra, 179–80.

We follow the *Esposito-Bruno* procedure in this case with the following modifications which are necessary to effectuate the sexual assault counselor privilege. The trial court's in camera review of a victim's records, if she consents, shall not be limited to merely "relevant material." The trial court's in camera review of the sexual assault counselor's records should determine if there are any inconsistent and relevant statements of the victim in the records when compared to the victim's direct examination. Interpretations, recollections, and counseling notations of the counselor do not qualify as statements of the victim and cannot be disclosed to the respondent. See *Matter of Pittsburgh Action Against Rape,* 494 Pa. 15, 28, 428 A.2d 126 (1981).[8] Relevant, inconsistent statements of the victim are only those statements which are verbatim accounts by the victim given to the counselor and which are directly related

---

[8] We note that subsequent to the decision in *Matter of Pittsburgh Action Against Rape,* 494 Pa. 15, 428 A.2d 126 (1981), the Pennsylvania legislature enacted a statute that granted rape counseling communications an absolute privilege. 42 Pa. Cons. Stat. Ann. § 5945 (Purdon 1982). We also note that the decision in *Matter of Pittsburgh Action Against Rape,* supra, did not involve a statutory privilege but centered on the issue of whether the common law should be expanded to create an absolute rape crisis counselor privilege. The competing interests discussed in *Matter of Pittsburgh Action Against Rape* are nonetheless relevant to the issue presented here.

to an essential element of the crime for which the respondent is standing trial. Inconsistent, as it is used above, does not refer to a lack of *complete* uniformity in details as compared to trial testimony. It is possible that the entire contents of the records of a victim may not be disclosable to defense counsel under our definition above, but any such decision awaits the scrupulous examination of a trial judge. Trial courts should be concerned with the intent of the legislature in enacting such a privilege, albeit now a limited one. A rape crisis counselor is specially trained to support and aid a victim of a sexual assault by encouraging her to "express her whole range of feelings without fear of judgment, rejection, or recrimination." Women's Rights Law Reporter 185, 195 (Summer 1985). All victims of sexual assaults are to some degree traumatized. The work of a trained rape crisis counselor can not only immediately but ultimately help the victim in her emotional and psychological recovery. Indiscriminate distribution or disclosure of a rape counselor's records by a trial court to defense counsel will surely destroy the effectiveness of a counselor-victim relationship if the need for confidentiality is not exacted.

If the trial court denies or limits the disclosure of the contents of the records after following the above procedure, then the undisclosed material that is the subject of the respondents' request should be sealed for possible review on appeal.

We must remand this case for further proceedings. We direct the trial court to follow the procedure outlined above. If the trial court determines that none of the material in the counselor's records should be disclosed, then none of the subpoenaed records are to be turned over to any of the respondents. If, on the other hand, the trial court determines that there are relevant, inconsistent statements of T in the subpoenaed records that should be disclosed to defense counsel and if, under

the modified *Esposito-Bruno* procedure set out above, the victim then consents to the release of such material, then a new hearing is ordered and the defense counsel are allowed to use this material. If, however, the victim does not consent to the release of such material, then her testimony shall be stricken and the trial court is ordered to make a redetermination of the respondents' adjudications and dispositions based upon the remaining evidence at the original hearing.

Although we remand this case for proceedings consistent with this opinion, our review of this case does not end here. Because the trial court may determine that the records may not be disclosed to defense counsel, we must address the respondents' other issues.

The respondents, Robert and Richard, claim that the trial court erred in finding them guilty of sexual assault in the first degree without proof of all the necessary elements. The respondents allege that the court advocate failed to prove that they intended to help the principal, Blair, or that they possessed "the same intent as the principal [under General Statutes § 53a-8],[9] that is, the specific intent to commit the crime of sexual assault. These respondents claim, with respect to the element of intent to help the principal, that the only evidence offered on this element was the testimony of the victim which was "not at all clear on cross examination. . . ."

The trial court was required to find that Richard and Robert intended to aid Blair in the commission of the sexual assault by force or threat of force and that they intended to commit the sexual assault and that the sexual assault did occur. See General Statutes §§ 53a-70

---

[9] General Statutes § 53a-8 provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

and 53a-8. The respondents do not challenge the sufficiency of the evidence that a sexual assault occurred but instead "presume" it for the purposes of their argument. Such an assault clearly took place, as the trial court found. The evidence as to the intent of the two boys to aid Blair is evident from the testimony of T. The trial court found that Blair assaulted T with "the assistance of Robert [H.] and Richard [C.] and their physically restraining her and holding her down while the act was consummated." The trial court also found that they "consciously and intentionally participated" in the sexual assault and "actively shared in its commission."

The findings of the trial court will not be disturbed unless they cannot be legally and logically supported. See *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221, 435 A.2d 24 (1980). "The evidence must be given a construction most favorable to sustaining the [trial court's] verdict." *State* v. *Carter,* 196 Conn. 36, 44, 490 A.2d 1000 (1985). "It is the trier of fact which determines the credibility of witnesses and the weight to be accorded their testimony." Id., 45. The trial judge was able legally and logically to conclude, from the testimony of T, that the two boys restrained T on the bed in a position to aid Blair in the assault with the broomstick. The respondents rely on T's testimony that she did not know what Blair intended to do with the broomstick when he walked into the room until he actually assaulted her as an indication that they too did not know what Blair intended to do with the broomstick. T also testified, however, that when Blair left the room, the boys allowed her to sit up but that when Blair reentered the room with the broomstick, they again pulled her back down and restrained her on the bed, naked from the waist down, and held her legs and arms while Blair assaulted her with the broom. The respondents, nevertheless, claim that the trial judge

has "failed to recognize" the third necessary element of the crime for which they were charged, the intent to commit sexual assault. The trial court found that not only did they aid Blair in the act but that they also "consciously and intentionally participated therein." The sequence of events, including their assistance to Blair in removing T's pants, and the manner in which T testified she was being held are clear evidence of Robert's and Richard's knowing and willing intent to aid Blair in sexually assaulting T and sufficient evidence of their intent to commit sexual assault.

The two separate intents necessary to this charge, to aid and to commit the assault, were therefore found by the trial court based on the evidence. See *State* v. *Vincent,* 194 Conn. 198, 207, 479 A.2d 237 (1984). There was sufficient evidence to support the trial court's finding of guilt on the charge of sexual assault in the first degree against Robert and Richard.

Blair also raises two issues that must be addressed. The adjudication stage is a two-step process which requires the court first to make a finding that a child is delinquent and then to make a disposition of the juvenile. The respondent, however, claims that although the court made a finding of delinquency in that it found Blair responsible for a delinquent act, the court did not make a finding that the child "needs the care, discipline or protection of the state"; General Statutes § 46b-140; before it adjudicated him a delinquent. Without this second finding, Blair claims that the court is without jurisdiction over him and erred in adjudicating him a delinquent. We do not read General Statutes § 46b-140[10] in

[10] General Statutes § 46b-140 (a) provides in relevant part: "The court, if it finds that the child is delinquent and needs the care, discipline or protection of the state, may adjudge him delinquent and place him in the care of any institution or agency which is permitted by law to care for children, order the child to remain in his own home or in the custody of a relative or any other fit person subject to the supervision of the probation officer or withhold or suspend execution of any judgment. . . ."

the same manner as the respondent does. We agree with the court advocate's claim that General Statutes § 46b-120,[11] entitled "Definitions," defines the circumstances under which a child may be found to be delinquent. In the present case, the court found the respondent Blair responsible for the act of sexual assault, a violation of state law and one of the statutory circumstances for which a child may be found delinquent. General Statutes § 46b-120 (c) (1). General Statutes § 46b-140, entitled in part "Disposition upon finding of delinquency," sets forth the various dispositions a court may order for a delinquent juvenile. The statute begins with a parallel construction: "(a) The court, if it finds that the child is delinquent and needs the care, discipline or protection of the state, may adjudge him delinquent and place him in the care of any institution . . . . " We agree with the court advocate that the parallel construction used "pairs [the] finding of delinquency with adjudication of delinquency and need for care with provisions for care." The court thus made the necessary finding of delinquency when it determined that the respondent had violated a state law and formalized this finding by adjudicating him a delinquent.

The court set the matter down for a predispositional hearing to determine Blair's need for the care, discipline and protection of the state and on April 30, 1984, the court made its disposition of the matter, committing Blair to the custody of DCYS for a period of time not to exceed one year.

[11] General Statutes § 46b-120 provides in relevant part: "The terms used in this chapter shall, in its interpretation and in the interpretation of other statutes, be defined as follows: 'Child' means any person under sixteen years of age . . . a child may be found 'delinquent' (1) who has violated any federal or state law or municipal or local ordinance, other than an ordinance regulating behavior of a child in a family with service needs as defined in this section or (2) who has violated any order of the superior court except any such order entered in a matter relating to a family with service needs . . . ."

The respondent, Blair, also claims that the court's disposition, a commitment to DCYS, was made without the findings required by General Statutes § 46b-140 (b),[12] specifically that a finding was not made that probation and other available services were inadequate. The respondent claims that the court should have chosen the least restrictive alternative for his disposition and that DCYS is a "last resort." The court advocate states that a review of the transcript of the dispositional stage shows that "the judge found a need in the Respondent which could not be met by Probation services or other services of the Court . . . ." We have thoroughly reviewed the transcript of the April 30, 1984 dispositional stage. The court, in addition to a predispositional study of Blair by a probation officer, heard the testimony of several defense witnesses including a clinical psychologist who interviewed and tested Blair one time for approximately one and one-half to two hours and a child adolescent psychiatrist who had met with Blair three or four times. The court considered the other alternative dispositions suggested by the expert witnesses, such as family therapy. The court, however, determined that only institutionalization, in the nature of commitment to the DCYS and its facility known as Long Lane, would provide the punishment commensurate with the seriousness of the offense. The court stated that the punishment would be "a start in the respondent's road to rehabilitation, because punishment for the sake of punishment, while it is not therapeutic, it does serve as a lesson and a deterrent. A lesson that antisocial activities are not

---

[12] General Statutes § 46b-140 (b) provides: "If the court further finds that its probation services or other services available to the court are not adequate for such child, the court shall commit such child to the department of children and youth services in accordance with the provisions of section 46b-141. Prior to making such commitment, the court shall consult with the department to determine the placement which will be in the best interest of such child."

acceptable and can be the first step towards making the therapy programs that are coincided with institutionalization and those that follow. You can make those programs more meaningful." The court thus did make a reasoned determination that "its probation services or other services" were not adequate for the particular psychological and disciplinary needs of Blair.

In addition, the court's disposition of this matter encompassed "the least restrictive alternative" commensurate with Blair's needs indicated by this "serious juvenile offense" under General Statutes § 46b-120, contrary to this respondent's claim. The court, as the respondent suggests should be the procedure, did make a "statement of the facts relied on in support [of its disposition] and the reasons for selecting the disposition and rejecting the less restrictive alternatives." The court could have committed the respondent to the custody of DCYS for a period of up to four years; General Statutes § 46b-141 (a); and the court specifically noted that Blair was not to be kept in "the secure unit" at Long Lane although his offense was a "serious juvenile offense." The court also stated as part of its disposition that Blair should be kept out of the confines of his community for a period of six months because it was a serious juvenile offense. The court's disposition was well within its statutory authority and indicates that it was well thought out and reasoned and based on all of the evidence and comprehensive reports before it. There was no error in the court's adjudication or disposition of Blair.

The case is remanded to the court, *Maiocco, J.,* for proceedings not inconsisent with this opinion.

In this opinion DANNEHY, SANTANIELLO and CALLAHAN, Js., concurred.

SHEA, J., concurring. Although I agree with the remainder of the majority opinion, I disagree with the

portion holding that "if the identity of the sexual assault counselor cannot be disclosed under General Statutes § 52-146k (b), then it would always be impossible to determine whether the statutory criteria set out in General Statutes § 52-146k (a) (5) were satisfied with respect to that sexual assault counselor." The criteria in subdivision (5) for determining whether a person qualifies as a "sexual assault counselor" require proof that such person (1) has received at least twenty hours of appropriate training, (2) is certified as a counselor by the sexual assault center which provided such training, (3) is under the control of a "direct services supervisor of a rape crisis center," and (4) is employed for the "primary purpose" of advising and assisting rape victims. It would not "always be impossible" to prove these facts without the testimony of the particular counselor who has conferred with the victim, as the opinion assumes. Other witnesses, such as the supervisor of the rape crisis center, could ordinarily be called to testify in proof of these requirements. The identity of the counselor would not necessarily have to be disclosed while her qualifications were being proved.

The majority opinion has effectively emasculated the statutory privilege for protection of the identity of the rape crisis counselor in declaring that disclosure of her identity is essential in order to determine whether she qualifies for the privilege under the criteria set forth in subdivision (5) of § 52-146k (b). The opinion does not respond to the paradox that, where a witness must testify in proof of her statutory right to protection of her identity, the defendant's constitutional right of confrontation entitles him to revelation of the very information the privilege was designed to protect. *Smith* v. *Illinois*, 390 U.S. 129, 88 S. Ct. 748, 19 L. Ed. 2d 956 (1968). The intention of the legislature to protect against disclosure of the identity of the sexual assault counselor for fear of harrassment or reprisal is no less

clear or less worthy of implementation than its purpose to prevent disclosure of the confidential communications of the victim without her consent. Even if the latter objective could be effectuated only at the expense of the former, as the majority opinion quite unnecessarily assumes, I fail to comprehend the basis upon which one of the two statutory privileges has been made subservient to the other.

Only in the event that the sexual assault counselor who assisted the victim in this case should take the stand to testify against the defendant would his right of confrontation require the disclosure on cross-examination of her identity. *Smith* v. *Illinois,* supra. At the point where the counselor involved is called as a witness, she should be given the opportunity to invoke her privilege under § 52-146k (b) not to disclose her identity by refusing to testify unless her statutory privilege is observed. Her right to exercise the privilege, which hinges upon proof of her status as a sexual assault counselor, could ordinarily be determined through the testimony of other witnesses concerning her qualifications prior to her appearance as a witness.