STATE OF CONNECTICUT *v.* ROBERT W. SPILLANE
(AC 17194)

Schaller, Spear and Healey, Js.

Argued January 21—officially released July 13, 1999

202

*Joel M. Ellis,* with whom, on the brief, was *Donald E. Weisman,* for the appellant (defendant).

*James M. Ralls,* assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *Rachel Baird,* assistant state's attorney, for the appellee (state).

*Opinion*

HEALEY, J. The defendant, Robert W. Spillane, was charged in a long form information with four offenses. The first two counts stemmed from the defendant's allegedly illegal towing of the victim's automobile. The third and fourth counts, which are not involved in this appeal, arose from a separate towing incident in which the defendant allegedly towed another automobile illegally while a child was in the backseat. The first count charged that on April 27, 1996, on Farmington Avenue in Hartford, the defendant committed the offense of larceny in the third degree in violation of General Statutes § 53a-124[1] "when [he], with intent to appropriate a motor vehicle to himself, wrongfully obtained and withheld the motor vehicle from its owner." The second count charged that on or about April 27, 1996, on Farmington Avenue in Hartford, the defendant committed

---

[1] General Statutes § 53a-124 (a) provides in relevant part: "A person is guilty of larceny in the third degree when he commits larceny as defined in section 53a-119 and: (1) The property consists of a motor vehicle, the value of which is five thousand dollars or less . . . ."

General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with the intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

the offense of larceny in the third degree in violation of § 53a-124 when he, "with intent to deprive another of property, specifically tools, wrongfully took, obtained and withheld such tools from the owner."

All four counts were tried together.[2] At the end of the state's case-in-chief, the defendant moved for a judgment of acquittal on all four counts. The trial court granted that motion only as to the second count. Pursuant to an amended information, the defendant presented his evidence as to the three remaining counts. After both parties rested, the defendant again moved for a judgment of acquittal on the remaining three counts, and the court denied that motion. The jury rendered a verdict of guilty on the first count and not guilty on the third and fourth counts. This appeal followed.

On appeal, the defendant claims that the trial court improperly (1) denied his motion for acquittal at the end of the state's case-in-chief, (2) denied his motion for acquittal at the conclusion of all of the evidence, (3) omitted from its final jury instructions the definition of "to deprive" or "to appropriate" as set out in General Statutes § 53a-118 and thus failed to instruct the jury about all of the necessary elements of larceny, (4) denied his motion to strike the testimony of the complaining witness, Webster Lewis, (5) refused to instruct the jury concerning the destruction of certain police tapes and (6) refused to give a missing witness instruction for the state's failure to call the wife of the complaining witness to testify. He also claims for the first time on appeal that the prosecutor's "improper" argument deprived him of his due process right to a fair trial under the United States and Connecticut constitutions.

---

[2] Prior to the taking of evidence, the trial court held a hearing on the defendant's motion for separate trials on the first and second counts on the one hand, and the third and fourth counts on the other. The trial court denied the defendant's motion for separate trials.

The jury reasonably could have found the following facts. On April 26, 1996, at some time between 10 and 11 p.m., Lewis kept an appointment to pick up an accident report at the state police department barracks on Washington Street in Hartford. He then picked up his girlfriend, Andrea Gudealm, at her apartment at 210 Farmington Avenue in Hartford and both went to a grocery store at about midnight. When they returned, Lewis parked his 1982 Datsun 280 ZX on Farmington Avenue in front of Gudealm's apartment house "where [he] always park[s]." Both went inside Gudealm's apartment for a while. When Lewis left to go home, he could not find his car. Gudealm called the police from a pay telephone to see if the car was towed. The police informed her that they had not towed Lewis' car and they gave her the telephone number of several towing companies. Upon calling Walnut Street Services, Inc. (Walnut Services), personnel of that establishment said that they had Lewis' car. They said that Lewis could not pick up the car until that afternoon.

On the afternoon of April 27, 1996, Lewis went to Walnut Services where he spoke to the defendant's wife, Cheryl Spillane. She told him that he could not have his car unless he paid the fees, approximately $148, in exact change. Lewis obtained that exact amount and paid it to Cheryl Spillane.[3] When he retrieved his car at the Walnut Services yard, Lewis found the driver's door open and he maintained that he had left it locked. He claimed that the glove compartment was open, that his papers were scattered and that some of the tools he had in the back of the car were missing. Lewis remonstrated with Cheryl Spillane about these matters. Apparently unsatisfied, Lewis called his place of business on

---

[3] Lewis testified that he thought Cheryl Spillane said the fee to get his car was "$148 in exact change." When Lewis paid her, she gave him a receipt for $134.25 on a printed tow slip of "Walnut Street Services, Inc." That receipt was in evidence as defendant's exhibit H.

Edward Street in Hartford and instructed them to call the police. He then returned to his shop and Hartford police officer Albert DiStefano arrived at about 12:30 p.m. in his cruiser. DiStefano drove Lewis to Farmington Avenue where Lewis pointed out where he had parked his car before it was towed. Lewis and DiStefano then returned to Walnut Services so that DiStefano could continue his investigation. DiStefano asked Cheryl Spillane to contact the defendant on the telephone so that "hopefully, maybe [we] could rectify the problem."

DiStefano, a fifteen year member of the Hartford police department, had dealt with the defendant "numerous times" over the years. Cheryl Spillane contacted her husband who spoke to DiStefano who asked if he would come to the tow yard to see if "we could work this problem out." The defendant was uncooperative and did not come. As a result of his investigation, DiStefano prepared an application, in affidavit form, for an arrest warrant charging the defendant with larceny in the third degree in violation of § 53a-124.[4] This application was offered by the defendant in his case and became a full exhibit without objection.[5] This exhibit contained the statement "that on April 27, 1996, the undersigned [DiStefano] received from Webster Lewis . . . a complaint of larceny against the accused [Robert] Spillane who owns Walnut Street Services, Inc., of 240 Walnut Street, [Hartford], CT."

I

The defendant first claims that the trial court improperly denied his motions for judgment of acquittal after

[4] This five page application contained information that Distefano had ascertained himself, information from Lewis, from whom Distefano had taken a sworn statement, and information from the Hartford police department. Distefano used this application as his report to the prosecutor. There was no arrest warrant issued.

[5] This exhibit, which was produced in court pursuant to defense counsel's subpoena, was offered in evidence as "an official record kept by the Hartford police department in the ordinary course of business."

the state's case-in-chief and after all of the evidence because the evidence was insufficient to sustain the larceny conviction on the first count. The state counters that the defendant failed to provide an adequate record to review as to the evidence in the state's case-in-chief. The defendant claims that that evidence is insufficient because there is no evidence that the defendant or one of his employees drove the tow truck that towed the Lewis car. The defendant further claims that there was no proof that the defendant owned Walnut Services. We disagree.

The reviewability of the defendant's case-in-chief sufficiency claim is barred because of the "waiver rule" applied in such cases as *State* v. *Rutan*, 194 Conn. 438, 440, 479 A.2d 1209 (1984). We agree with the state that in the defendant's election, after the denial of his motion for judgment of acquittal at the end of the state's case-in-chief, to proceed and put on his own evidence, he waived his right to appellate review of the sufficiency of the evidence at end of the state's case-in-chief. This is particularly so, the state argues, because Spillane affirmatively proceeded to put on his own evidence, including evidence that he actually towed the Lewis car, and, therefore, pursuant to the waiver rule in *State* v. *Rutan*, supra, 440, "appellate review encompasses the evidence in toto." See *State* v. *Gilbert*, 52 Conn. App. 531, 533 n.2, 727 A.2d 747 (1999). Under *Rutan*, by deciding to produce his own evidence, the defendant runs the risk that his case will fill an evidentiary gap in the state's case. Although *Rutan* has been criticized, it nevertheless remains the law. See, e.g., *State* v. *Simino*, 200 Conn. 113, 118 n.5, 509 A.2d 1039 (1986); *State* v. *Lizzi*, 199 Conn. 462, 464–65, 508 A.2d 16 (1986); *State* v. *Duhan*, 194 Conn. 347, 382, 481 A.2d 48 (1984); *State* v. *Garrett*, 42 Conn. App. 507, 514 n.6, 681 A.2d 362, cert. denied, 239 Conn. 928, 929, 683 A.2d 397 (1996).

The defendant, however, asks us to make an exception to the rule in *Rutan* and to rule that where the defendant goes forward and does not fill in any evidentiary gaps in the state's case, then the *Rutan* waiver rule should not apply. The defendant provided no authority for that claim, and we have found no such authority. We need not answer the defendant's claim of no waiver "if the defendant adds nothing to the state's case" because he did add to the state's case as we point out. We will apply *Rutan* in this case on the sufficiency issue and review the evidence in toto.

"Our Supreme Court has stated: In reviewing [a] sufficiency [of evidence] claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Radzvilowicz*, 47 Conn. App. 1, 16, 703 A.2d 767, cert. denied, 243 Conn. 955, 704 A.2d 806 (1997).

"The evidence must be construed in a light most favorable to sustaining the jury's verdict. *State* v. *Carter*, [196 Conn. 36, 44, 490 A.2d 1000 (1985)]. It is within the province of the jury to draw reasonable and logical inferences from the facts proven. Id.; *State* v. *Williams*, 169 Conn. 322, 336, 363 A.2d 72 (1975). The jury may draw reasonable inferences based on other inferences drawn from the evidence presented. *State* v. *Williams*, 202 Conn. 349, 355, 521 A.2d 150 (1987); *State* v. *Carter*, supra, 44–45; *State* v. *Gabriel*, 192 Conn. 405, 425, 473 A.2d 300 (1984). . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable. . . . *State* v. *Ford*, 230 Conn. 686, 692, 646 A.2d 147 (1994). We note that the probative force of the evidence

is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence. *State* v. *Robinson*, 213 Conn. 243, 254, 567 A.2d 1173 (1989). *State* v. *Lago*, 28 Conn. App. 9, 30, 611 A.2d 866, cert. denied, 223 Conn. 919, 614 A.2d 828 (1992). . . . [T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . *State* v. *Boykin*, 27 Conn. App. 558, 563–64, 609 A.2d 242, cert. denied, 223 Conn. 905, 610 A.2d 179 (1992)." (Citations omitted; internal quotation marks omitted.) *State* v. *Rozmyslowicz*, 52 Conn. App. 149, 152–53, 726 A.2d 142 (1999).

Additional facts are necessary for the resolution of this claim. The place where the Lewis car was parked at the time it was towed was hotly contested at the trial. Lewis testified that he had parked his car on the street, namely, Farmington Avenue. The defendant claimed and offered evidence to prove that the Lewis car was not parked on Farmington Avenue, but on the private property of the Mechanics Savings Bank (bank), which was on Farmington Avenue next to the apartment house in which Gudealm resided. Walnut Services and the bank had a contract whereby the bank permitted Walnut Services to remove unauthorized vehicles parked on their property in front of the bank. The bank paid nothing to Walnut Services for removing such vehicles but Walnut Services charged the owners a fee for the release of vehicles so towed.

Cheryl Spillane testified that on April 27, 1996, at approximately 12:50 a.m., she saw a black Datsun (the Lewis car) parked on the bank's private property. She

called the tow truck, and her husband, the defendant, arrived driving the truck with Armando Rodriguez as his helper and the Lewis car was towed away. According to Rodriquez' testimony, the towing receipt showed the name "Mickey" on the tow slip was the driver of the tow truck that towed the Lewis car on the night in question. Rodriguez also testified that Mickey was the defendant. Rodriguez, in fact, was with the defendant when the Lewis car was towed. Accordingly, there was ample evidence to find that the defendant drove the tow truck that towed the Lewis car.

Alternatively, Rodriguez testified that he had worked for the defendant part-time for the past ten years at what is presently known as Walnut Services. Moreover, exhibit G, which was produced in court pursuant to defense counsel's subpoena, was offered in evidence as "an official record kept by the Hartford police department in the ordinary course of business." As noted, exhibit G was admitted without objection. "Exhibits are admissible in their entirety unless the officer excises the irrelevant or prejudicial portions. See *Mucci* v. *LeMonte*, 157 Conn. 566, 570–71, 264 A.2d 879 (1969); C. Tait & J. LaPlante, Connecticut Evidence (2d Ed.) § 3.5.5." *Swenson* v. *Sawoska*, 215 Conn. 148, 151 n.3, 575 A.2d 206 (1990). We recognize that a police report is generally admissible under General Statutes § 52-180 and does not require that everything contained in the report be admitted into evidence. *Mucci* v. *LeMonte*, supra, 569. "For an item contained in a report to be admissible, it must be based on the entrant's own observation or on information of others whose business duty it was to transmit it to the entrant." Id. In this case, not only was the police report offered by the defendant as a full exhibit, without any limitation or request for redaction, but the information regarding the ownership of Walnut Services was in a report made by a police officer who had dealt with the defendant "numerous

times" over the years. Therefore, there was ample evidence to find that the defendant owned Walnut Services.

The defendant also argues that we should apply General Statutes §§ 14-145 and 14-145b. Those statutes, however, address the towage and removal of motor vehicles from *private* property. There was testimony that a citation issued by the Hartford police department was required before the defendant would have the authority to tow from a public highway. There was no such citation offered in evidence. The jury's finding that the Lewis car was *not* towed from private property, but from a public highway, renders those statutes inapplicable. It is clear from the verdict on the larceny count that the jury did not find that the Lewis car was towed from the bank's private property, but rather from where it was parked on Farmington Avenue. The application of our case law cited previously on the criteria to be applied to the facts found by the jury demonstrates that there was sufficient evidence to sustain the guilty verdict on the first count of larceny in the third degree in violation of § 53a-124.[6]

## II

The defendant claims next that the trial court improperly charged the jury when it omitted the definition of "to deprive" or "to appropriate" that is set out in § 53a-118 and, therefore, failed to instruct the jury about the necessary elements of the crime of larceny. The defendant properly preserved this claim by filing a written request to charge. See Practice Book § 42-16.

[6] In oral argument before this court, defense counsel conceded that *if* the evidence disclosed that the defendant was an employee of Walnut Services in towing the Lewis car and that the $148 release fee was paid to an employee of that corporation (as it was to Cheryl Spillane) in exchange for the Lewis car, and if there was any evidence of the defendant's being an owner of that corporation, then a trier of fact could, if it chose, infer that the defendant had the requisite intent to dispose of the Lewis car for the $148 even though he did not personally receive the $148 in hand from Lewis.

## A

The defendant claims that the trial court, in its jury instruction, improperly failed to define the meaning of the terms "to deprive" and "to appropriate," both of which are defined in § 53a-118.[7] The state argues that it was not necessary for the trial court to define "to deprive" because, at the trial and on appeal, its theory was not based on the "to deprive" aspect of larceny as defined in § 53a-118 (a) (3), but rather its theory was based on the "to appropriate" prong of § 53a-118 (a) (4) (B). We agree.

We look first to the charging document, the information. The first count, in charging larceny in the first degree in violation of § 53a-124, charges that the defendant committed that offense "when [the defendant] with intent to *appropriate* a motor vehicle to himself, wrongfully took, obtained and withheld that motor vehicle from the owner."[8] (Emphasis added.) That count not only contains the "to appropriate" language that is set forth in § 53a-118 (a) (4), but also sets out the "*intent . . . to appropriate*" (emphasis added) phraseology of § 53a-119,[9] as well as the other operative language § 53a-

[7] We note that the topical sentence of § 53a-119 defining larceny is in the disjunctive; that is, it defines larceny as follows: "A person commits larceny when, with intent to deprive another of property *or* to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner." (Emphasis added.)

[8] The first count as set out in the long form information alleged: "The state of Connecticut, upon this information, charges that the defendant, Robert W. Spillane, in the above matter referenced H14HCR96-0487899-S, did, on or about April 27, 1996, in the vicinity of Farmington Avenue, city of Hartford, commit the criminal offense of Larceny in the third degree, in violation of section 53a-124 of the Connecticut General Statutes, when the defendant, Robert W. Spillane, with intent to appropriate a motor vehicle to himself, wrongfully took, obtained and withheld that motor vehicle from the owner."

[9] General Statutes § 53a-119 provides in relevant part: "Larceny defined. A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

119, i.e., wrongfully takes, obtains or withholds such property from the owner. Further, and significantly, that count, in referring to the defendant's intent, clearly alleges that it was "to appropriate that motor vehicle to himself . . . ." That language clearly tracks the language of the alternate prong of § 53a-118 (a) (4) set out in § 53a-118 (a) (4) (B).[10]

In objecting to the defendant's motion for a judgment of acquittal on all four counts at the end of the state's case-in-chief, the state set out its position on each count. It stated that, as to the first count, it was "proceeding" under that part of § 53a-124 that involved a motor vehicle whose value was $5000 or less. It then pointed out that the statute contains "alternates . . . for the state to prove larceny . . . and in this case the state chose the method of which the defendant with intent to appropriate a motor vehicle to himself." Speaking of § 53a-118 (a) (4) (B), the state further explained its theory as to the first count saying "[t]o appropriate, it is defined under § 53a-118 provision four," and quoting directly from § 53a-118 (a) (4) (B) said: " 'To appropriate property of another to oneself or to a third person means,' and this states again under (B), 'to dispose of the property for the benefit of oneself or a third person.' "[11]

---

[10] General Statutes § 53a-118 (a) (4) provides in relevant part: "To 'appropriate' property of another to oneself or a third person means . . . (B) to dispose of the property for the benefit of oneself or a third person." The state mentions the notice argument; however, we believe that the language of that count alone satisfies the defendant's sixth amendment right under the United States constitution and article first, § 8, of the constitution of Connecticut, both of which guarantee a criminal defendant the right to be informed of the nature and cause of the charge against him with sufficient precision to enable him to meet the elements of the charge at trial. See *State* v. *McDougal*, 241 Conn. 502, 521, 699 A.2d 872 (1997), and cases therein cited. We note that the defendant never sought a bill of particulars as to this count, as was his right. See Practice Book § 41-20.

[11] In arguing its theory that it was relying on the "to appropriate" alternative of § 53a-118 (a) (4), the state also said at that time: "[T]he state's theory in this case that the defendant with intent to appropriate . . . Lewis' motor vehicle to himself that he wrongfully appropriated it from a public roadway which was not allowed as Officer Distefano testified because there was no

Defense counsel did not then or thereafter at trial take issue with the state's theory on the first count. He did not claim surprise but proceeded to go forward with his own case. During its argument to the jury, the state argued that the defendant, in towing the Lewis car, was motivated by the money that would be obtained by towing the car and then charging the owner money to get the car back.

Further, it is also clear that the state's theory at trial on the first count was based on § 53a-118 (a) (4) (B) alone when one examines the second count.[12] In the second count, the state charged the defendant with larceny in the third degree "in violation [of § 53a-124], when the defendant . . . with intent *to deprive another of property*, specifically, tools [in the Lewis car], wrongfully took, obtained and withheld such tools from the owner." (Emphasis added.) It is apparent that the state, with prosecutorial selectivity, intended to and charged the defendant with the "to appropriate" prong of this statute in the first count, § 53a-118 (a) (4), and with the "to deprive another of property" prong of the same statute in the second count, namely § 53a-118 (a)

citation issued by the Hartford police department [prior to towing the vehicle]. That public roadway being the jurisdiction of the Hartford police department. That the defendant wrongfully appropriated that motor vehicle. That he wrongfully took, he obtained it, and withheld it at Walnut Street Services. That he called that into Walnut Street Services. And there is, I believe, it's defendant's exhibit F that shows that Walnut Street Services called it in, although there was no testimony that it was the defendant himself who drove the tow truck at the time. The state is proceeding under the theory that it was either [the defendant] or someone under his control working for him as he is the owner of Walnut Street Services."

[12] The second count of the information alleges: "The state of Connecticut, upon this information, charges that the defendant, Robert W. Spillane, in the above matter referenced H14HCR96-0487899-S, did, on or about April 27, 1996, in the vicinity of 204 Farmington Avenue, city of Hartford, commit the criminal offense of Larceny in the third degree, in violation of § 53a-124 of the Connecticut General Statutes, when the defendant, Robert W. Spillane, with intent to deprive another of property, specifically, tools, wrongfully took, obtained and withheld such tools from the owner."

(3), an entirely different subsection. The defendant's claim that the trial court's failure to instruct on "to deprive" is not persuasive.

B

The state, in further responding to the defendant's challenge of the jury instructions, argues that not only was the "to appropriate" prong the only applicable prong of § 53a-118 (a), but also maintains that the charge on "to appropriate" was fully adequate. We do not agree.

In examining the jury instructions[13] on the first count, certain additional principles need to be set out. As noted, the statute itself states that the term "[t]o 'appropriate' property of another to oneself or a third person *means* . . . (B) to dispose of the property for the benefit of oneself or a third person." (Emphasis added.)

---

[13] The trial court's instruction on larceny in the third degree was as follows: "In this case, ladies and gentlemen, the first count of the information charges the defendant with the crime of larceny in the third degree in violation of § 53a-124 (a) of the Connecticut General Statutes. That section of the statute provides in pertinent part as follows: A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself he wrongfully takes, obtains or withholds the property from an owner. Each of the following elements must be proved by the state beyond a reasonable doubt. First, that the defendant wrongfully took, obtained or withheld property from an owner. And second, that at the time the defendant obtained the property, he intended to appropriate that property to himself or a third person. Basically, larceny means theft or stealing.

"The first element of the larceny that you must consider is the wrongful taking, obtaining or withholding of property from an owner. Taking means any wrongful taking of property away from the possession or control of the person entitled to the property. Obtaining means wrongfully obtaining property from another. Withholding means wrongfully keeping property from its owner.

"Wrongfully means there is no legal justification or excuse for the taking, obtaining or withholding. Now, under our statutes, the property involved must be a motor vehicle with a value of $5000 or less. The state must prove to you beyond a reasonable doubt that first, [the defendant] wrongfully took, obtained or withheld property from the owner and at the time he did that, he intended to appropriate the same to himself or a third person."

General Statutes § 53a-118 (a) (4) (B). The legislature by using the word "means" has itself defined this term in words it chose. The United States Supreme Court has said: "As a rule, '[a] definition which declares what a term "means" . . . excludes any meaning that is not stated.' 2A C. Sands, Statutes and Statutory Construction § 47.07 (4th Ed. Supp. 1978)." *Colautti* v. *Franklin*, 439 U.S. 379, 392 n.10, 99 S. Ct. 675, 58 L. Ed. 2d 596 (1979); see *Johns-Manville Corp.* v. *United States*, 855 F.2d 1556, 1559 (Fed. Cir. 1988). "When legislation defines the terms used therein such definition is exclusive of all others. *Neptune Park Assn.* v. *Steinberg*, 138 Conn. 357, 362, 84 A.2d 687 (1951)." *Rhode Island Hospital Trust National Bank* v. *Trust*, 25 Conn App. 28, 31, 592 A.2d 417 (1991); see 2A Sutherland, Statutory Construction (5th Ed. Singer 1992) § 47.07, p. 152 (general rule that definition that declares what term means excludes any meaning not stated).

It is clear then that the legislature declared that under § 53a-118 (a) (4) (B), "[t]o 'appropriate' property of another to oneself or a third person *means* . . . (B) to dispose of the property for the benefit of oneself or a third person." (Emphasis added.) General Statutes § 53a-118 (a) (4) (B). The "to appropriate"[14] language is an essential element[15] of the crime charged in the information on which the state has the burden of producing evidence and the burden of persuading the jury beyond a reasonable doubt.

---

[14] We note that the statute does not contain a definition of the term "dispose." "If a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *State* v. *Payne*, 240 Conn. 766, 771, 698 A.2d 525 (1997).

[15] "An element [of our offense] is a fact that must be proved by the prosecution in order to sustain a conviction, that is, a fact of which the Commonwealth has both the burden of producing some evidence and the burden of persuading the trier of fact beyond a reasonable doubt." *Commonwealth* v. *Burke*, 390 Mass. 480, 483, 457 N.E.2d 622 (1983).

On appeal, the state recognizes that the jury instructions did not include a specific instruction about the "to appropriate" part of § 53a-118 (a) (4) (B) even though it concedes that "to appropriate" was *defined* in the statute. The state, nevertheless, maintains that the jury was instructed that when the defendant obtained the property, he must have "intended to appropriate that property to himself or a third person," and that "basically, larceny means theft or stealing," as well as arguing that it told the jury that the state must prove that the defendant wrongfully took, obtained or withheld the vehicle "and at the time he did that, he intended to appropriate the same to himself." The state then argues that "[w]hile the court did not undertake to define '[to] appropriate' in a detailed fashion, the jury clearly would have utilized the common, ordinary meaning of the term, which comports with the statutory definition." The state claims in its brief that "to appropriate" is defined in several ways[16] and that, given the context of the term "to appropriate," the jury "would have employed those terms in defining "to appropriate" by definitions of that term that are "fully compatible with the definition under § 53a-118 (a) (4) (B)."

It is evident that the state argues on appeal that the jury could have employed "to appropriate" in terms

---

[16] The state's brief sets out the following definitions of "to appropriate": " '1: To annex (a benefice) to a spiritual corporation of its perpetual use—distinguished from *inappropriate*; 2: *archaic* . . . 3a: to make peculiarly the possession of someone . . . b: to claim or use as if by an exclusive or preeminent right . . . 4: *archaic* . . . 5: to set apart for or assign to a particular purpose or use in exclusion of all others . . . 6: to take without permission: pilfer, purloin . . . .' Webster's Third New International Dictionary. 'Preempt,' 'usurp,' 'arrogate' and 'confiscate' are also listed as synonyms, which terms all mean 'to seize or take over more or less dictatorially.' Id." In continuing its argument in this context, the state claims that the jury would have employed those terms in defining the word as "to make peculiarly the possession of," "to claim or use as if by an exclusive or preeminent right," "to set apart for or assign to a particular purpose or use in exclusion of all others," "to take without permission: pilfer, purloin," and "to seize or take over more or less dictatorially."

of these dictionary definitions, as to which it was not instructed, and thus derived a definition of "to appropriate" fully compatible with the definition under § 53a-118 (a) (4) (B). Such an argument implicitly concedes the flaw in the trial court's instruction. The statute says what "to 'appropriate' means" and that *is* the definition.

We cannot accept the state's argument here. We are dealing with an essential element of the crime charged in which an operative term, "to appropriate," is specifically defined by statute. The jury was neither instructed on the legislature's meaning of "to appropriate," nor that it constituted part of the second element that the jury "must consider" in determining whether the defendant had the requisite intent to be found guilty of larceny. See A. Ment & R. Fracasse, Connecticut Selected Jury Instructions: Criminal (3d Ed. 1995) § 9.1. While our Supreme Court has "repeatedly disapproved of a trial court's reading of an entire statute when the defendant has been formally charged under less than all the statute as a whole"; *State* v. *Townsend*, 206 Conn. 621, 627, 539 A.2d 114 (1988); the defendant is entitled to have the jury adequately instructed on that part of the statute with which he *is* charged. We concluded previously that the evidence was sufficient to convict the defendant on the first count of larceny under § 53a-118 (a) (4) (B). That verdict of guilty cannot stand, however, because of the trial court's improper instruction, which improperly charged on the element of "intent to appropriate" under that statute. "Larceny is defined in General Statutes § 53a-119 as follows: 'A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . .' This crime has three elements and all three must be established beyond a reasonable doubt. It must be shown that (1) there was an intent

to do the act complained of, (2) the act was done wrongfully, and (3) the act was committed against an owner."[17] *State* v. *Varszegi*, 33 Conn. App. 368, 372, 635 A.2d 816 (1993), cert. denied, 228 Conn. 921, 636 A.2d 851 (1994). This appeal focuses on the element of intent.

"Our standard of review concerning claims of instructional error is well settled. [J]ury instructions must be read as a whole and . . . are not to be judged in artificial isolation from the overall charge. . . . The whole charge must be considered from the standpoint of its effect on the jurors in guiding them to a proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . *Hall* v. *Burns*, 213 Conn. 446, 475, 569 A.2d 10 (1990). The instruction must be adapted to the issues and may not mislead the jury but should reasonably guide it in reaching a verdict. *Lemonious* v. *Burns*, 27 Conn. App. 734, 740, 609 A.2d 254, cert. denied, 223 Conn. 915, 614 A.2d 823 (1992). We must review the charge as a whole to determine whether it was correct in law and sufficiently guided the jury on the issues presented at trial. *State* v. *Coleman*, 35 Conn. App. 279, 292, 646 A.2d 213 [cert. denied, 231 Conn. 928, 648 A.2d 879] (1994). . . . *State* v. *Elijah*, 42 Conn. App. 687, 691, 682 A.2d 506, cert. denied, 239 Conn. 936, 684 A.2d 709 (1996). An error in the charge requires reversal only if, in the context of the whole instruction, there is a reasonable possibility that the jury was misled in reaching its verdict." (Internal quotation marks omitted.) *State* v. *Pompei*, 52 Conn. App. 303, 307–308, 726 A.2d 644 (1999).

Our review of the charge in its entirety leads us to conclude that the trial court improperly failed to instruct the jury, specifically, that the larceny charged here requires proof of an intent to appropriate the prop-

---

[17] We note that the trial court's instructions did not include any definition of the term "owner." That term is defined in General Statutes § 53a-118 (a) (5).

erty of an owner for the *benefit* of oneself or a third person. "Because larceny is a specific intent crime, the state must show that the defendant acted with the subjective desire or knowledge that his actions constituted stealing. A specific intent to deprive another of property or to appropriate the same to himself [or a third person] . . . is an essential element of larceny . . . and as such must be proved beyond a reasonable doubt by the state." (Internal quotation marks omitted.) *State* v. *Varszegi*, supra, 33 Conn. App. 372. General Statutes § 53a-118 (a) (4) provides: "To 'appropriate' property of another to oneself or a third person means . . . (B) to dispose of the property for the *benefit* of oneself or a third person." (Emphasis added.)

On the element of intent, the trial court gave a general instruction to the jury that "[i]ntent relates to the condition of mind of the person who commits the act, his purpose in doing it. As defined by our statutes, a person acts intentionally with respect to a result or to conduct when his conscious objective is to cause such result or to engage in such conduct." The trial court then went on to explain that intent was to be determined by inference and charged according to the jury's finding of inferences in general. The contested issue in this case was whether the defendant intended to appropriate the Lewis car for the defendant's *benefit* or that of a third person, namely, the corporation, as the defendant was the owner. The jury instruction actually given required the jury to determine whether the defendant appropriated the car directly to himself or to the corporation as the jury instructions were read without further giving the jury the legislature's definition of to "appropriate" in § 53a-118 (a) (4) (B), which was applicable in this case.

" 'If justice is to be done . . . it is of paramount importance that the court's instructions be *clear*, accurate, *complete* and comprehensible, particularly with respect to the essential elements of the alleged crime.' *United States* v. *Clark*, 475 F.2d 240, 248 (2d Cir. 1973);

see *State* v. *Kurvin*, [186 Conn. 555, 561, 442 A.2d 1327 (1982)]; *State* v. *Griffin*, [175 Conn. 155, 163, 397 A.2d 89 (1978)]. With the defendant's not guilty plea the burden rested on the state to demonstrate his guilt by proving each essential element of the crime charged beyond a reasonable doubt. *Mullaney* v. *Wilbur*, [421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975)]; *In re Winship*, [397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)]; *State* v. *Griffin*, supra, 162." (Emphasis added.) *State* v. *Gabriel*, 192 Conn. 405, 416, 473 A.2d 300 (1984).

Moreover, given the trial court's absence of a careful relation of the evidence to the elements of the larceny charge, it is reasonably possible that the jury was misled by the court's failure to read the statutory name and definition of "appropriate" as it relates to intent. See *State* v. *Smith*, 194 Conn. 213, 219, 479 A.2d 814 (1984). "The charge must give the jury a clear understanding of the elements of the crime charged and the proper guidance to determine if those elements were present. *State* v. *Avila*, 166 Conn. 569, 574, 353 A.2d 776 (1974). *State* v. *Kurvin*, supra, [186 Conn.] 573 (*Speziale, C. J.*, dissenting)." (Internal quotation marks omitted.) *State* v. *Smith*, supra, 219–20. Taken as a whole and limited to the facts of this case, it was reasonably possible that the trial court's instructions did not guide the jury to a clear and complete understanding of the offense.

Accordingly, the judgment must be reversed and a new trial ordered.

### III

Although our holding requires a new trial, we will nevertheless, consider two of the remaining issues raised by the defendant as they are likely to arise in the new trial. See *State* v. *Whitaker*, 202 Conn. 259, 268, 520 A.2d 1018 (1987). These two issues are interrelated and discussed extensively in the briefs and will be taken

up together. The defendant claims that the trial court improperly (1) refused to give his request to charge No. 10 concerning the "destruction" of certain tapes or recordings (tapes) made by the Hartford police department and, therefore, (2) denied his motion to strike the testimony of the complaining witness, Lewis.[18] He claims that the failure of the police department to preserve the tapes denied him a fair trial under article first, § 8, of the constitution of Connecticut.[19]

The discussion of these issues requires setting out the following additional facts. On May 10, 1996, in response to the defendant's motion to preserve evidence, the defendant asked for an order directing the police department to preserve its tapes of telephone calls to the police department made by the defendant and Lewis on April 27, 1996.[20] The trial court entered such an order on that date. It was stipulated at trial

[18] Prior to the trial itself, the defendant filed a motion to dismiss all the charges against him. Essentially, that motion alleged that Lewis had called the Hartford police department to report the "theft" of his car, that the defendant had telephoned the police department to report that he had towed the Lewis car, that the trial court had granted his motion on May 10, 1996, to order the Hartford police department to preserve and maintain for trial the tapes of phone conversations made on April 27, 1996, to the Hartford police department by the defendant and Lewis, that the Hartford police department "had destroyed" the tapes of those telephone calls, that the tapes contained "crucial evidence" tending to prove his innocence, that their nonavailability would prejudice his defense, and, therefore, the pending criminal charges should be dismissed. The court held a hearing on the motion at which evidence was addressed. The trial court denied this motion.

In denying this pretrial motion, the trial court noted that the tapes might be of use to the defendant in terms of exculpatory evidence and might provide grounds for possibly impeaching the testimony of Lewis. Because, however, the court had not yet heard Lewis' testimony, it indicated that it was not in a position to grant the motion to dismiss. It told the state that it would depend on Lewis' testimony.

[19] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

[20] Although such telephone calls would normally be tape-recorded, the Hartford police department generally keeps tapes for only thirty days.

that the state's attorney's office notified the police department of that order on May 10, 1996. The police department could not produce these tapes for trial as they were not preserved and probably recycled.[21] By letter dated June 3, 1996, the police sergeant responsible for preserving the daily tapes, in response to defense counsel's request to listen to the tapes, wrote counsel a letter indicating that the tapes were probably erased and recycled.

There was evidence, however, that there were four calls to the police department on April 27, 1996, regarding the towing incident. The first call was at 1:30 a.m. in which Walnut Services reported its tow of the Lewis car from Farmington Avenue, (2) the second call was from Gudealm shortly after 1:30 a.m. inquiring whether the police department had towed the Lewis car from Farmington Avenue, (3) the third call was at 2:40 a.m.,[22] which suggested that the car was stolen from 100 Washington Street, and (4) the fourth call was from Lewis at 1:01 p.m. in the afternoon in which he claimed that his car was "stolen" from the street at 204 Farmington Avenue.

At trial, Lewis testified that when he found his car missing from where he had parked it on Farmington Avenue, Gudealm called the police department to find out if the car was towed. She testified that the police department informed her that it did not tow Lewis' car and gave her the telephone numbers of several towing companies. Lewis then called his wife in New Britain

---

[21] The Hartford police department official, who normally received such orders, testified that he was unable to determine whether notice of the May 10, 1996 court order reached him in time for the tapes to be preserved. His review of the department ledger, in which the receipt of such orders was noted, was unavailing. In any event, there was no evidence as to what in fact happened to the tapes that would have included the telephone calls to the police department on April 27, 1996, of the defendant and Lewis.

[22] There was evidence that suggested that this call was made by either Lewis or his wife, Patricia, with whom he lived in New Britain.

and told her that his car was stolen and he asked her to report it to the police. He did not, however, tell her that he had already picked up the accident report at the state police barracks at 100 Washington Street nor that he was with Gudealm at her apartment.

During his own case and after his presentation of evidence from members of the police department, the defendant moved that the trial court strike Lewis' testimony. In doing so, he referred to the trial court order of May 10, 1996, directed to the police department to preserve the tapes of the telephone calls of April 27, 1996. In addition, defense counsel urged that the tapes would have impugned Lewis' testimony as to who made the 2:40 a.m. call on April 27, 1996, the content of that call, as well as its bearing on Lewis' testimony of his car's being towed from 204 Farmington Avenue as contrasted with its having been stolen from 100 Washington Street. The state objected that defense counsel did not move to strike Lewis' testimony after he testified but went on to cross-examine Lewis concerning the discrepancies in the reports from where his car was stolen and, in any event, had ample opportunity to cross-examine Lewis. The state urged, in addition, that striking Lewis' testimony would be a harsh sanction as there was no evidence that the tapes were erased or recycled in bad faith or that they were intentionally destroyed.

The trial court, referring to a "balancing test," denied the motion to strike Lewis' testimony, noting that there was "ample evidence in the record, testimony and other evidence in the record, which would support the argument that the defendant may make to the jury with regard to who called, what, when, without having the tapes themselves." It further indicated that there was "ample opportunity to cross-examine . . . Lewis about those reports." It, thereupon, denied the defendant's motion to strike.

In *State* v. *Morales*, 232 Conn. 707, 657 A.2d 585 (1995), our Supreme Court was called upon to decide whether, in order to prove a claim that a criminal defendant was deprived of due process of law under the constitution of Connecticut, that defendant must prove that the police acted in bad faith in failing to preserve potentially exculpatory evidence. In *Morales*, the court rejected the bad faith showing that was a requisite for a federal due process claim under *Arizona* v. *Youngblood*, 488 U.S. 51, 106 S. Ct. 333, 102 L. Ed. 2d 281 (1988), for determining whether a defendant was afforded due process under our state constitution. *State* v. *Morales*, supra, 726–27. Opining that "the good or bad faith of the police . . . cannot be dispositive of [such a claim]"; id., 726; the *Morales* court said: "Rather, in determining whether a defendant has been afforded due process of law under the state constitution, the trial court must employ the *Asherman* balancing test, weighing the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: [1] 'the materiality of the missing evidence, [2] the likelihood of mistaken interpretation of it by witnesses or the jury, [3] the reason for its nonavailability to the defense and [4] the prejudice to the defendant caused by the unavailability of the evidence.' *State* v. *Asherman*, [193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).]" *State* v. *Morales*, supra, 726–27.

In analyzing this issue, we employ the four factors of the *Asherman* balancing test. In applying the first *Asherman* factor, we must evaluate the materiality of the unpreserved tapes. "The measure of materiality is whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of

the proceeding would have been different." (Internal quotation marks omitted.) *State* v. *Joyce*, 243 Conn. 282, 301, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998), quoting *State* v. *Valentine*, 240 Conn. 395, 417–18, 692 A.2d 717 (1997). The defendant's claims concern who made the telephone call at 2:40 a.m. and its content, as well as the content of the telephone call admittedly made by Gudealm.[23] The tape would be minimally material at most as to the 2:40 a.m. call.

As the state correctly argues, the essential issue concerns who made the 2:40 a.m. call with the defendant claiming that Lewis, and not his wife, made that call. The tapes would not at all impugn the substance of that call as Lewis and the state conceded that the car was erroneously reported as stolen from 100 Washington Street. Lewis even said that "it's a possibility" that he called the police department on the morning of April 27, 1996. Even the evidence from several police department members, all of whom were defense witnesses, was in conflict as to whether a stolen car report would be taken from the actual owner of the car only as opposed to other testimony that the report in evidence did not in fact identify the person who reported the car "stolen" but merely identified the owner as Lewis. The defendant's claim that his conviction rested on Lewis' testimony is without merit.

The defendant next argues that the tapes would have resolved the credibility issue concerning Gudealm's testimony that Lewis' car was parked on Farmington Avenue and that she called the police department to report it missing. The defendant argues that the evidence conflicts with certain evidence from the police department

---

[23] Although there were allegedly four calls that were on the unpreserved tapes, the tapes were irrelevant insofar as the first (1:31 a.m.) and fourth calls (1:10 p.m.), as there is no dispute of the source and content of each of these calls.

to the effect that the car was stolen from Washington Street. For the first time on appeal, the defendant makes the claim that the tapes "may have revealed"[24] that Gudealm reported the car missing from the Mechanics' Bank private parking lot on Farmington Avenue. The defendant never made this claim in the trial court. Moreover, the defendant never made any motion in the trial court to strike Gudealm's testimony as he did with Lewis. Accordingly, the necessary measure of materiality under *Asherman* was not demonstrated.

The second *Asherman* factor we must consider is "the likelihood of mistaken interpretation of this missing evidence by the witnesses or by the jury." There was scarce chance, let alone any likelihood, of such mistaken interpretation in this matter. The defendant was given wide latitude not only in his cross-examination of Lewis and Gudealm, but also in his examination of police department members about relevant police procedures, including the handling of reports of stolen vehicles, whether such calls would be taken from a spouse who was not in fact the actual owner of a missing car, be it stolen or otherwise, the calls of April 27, 1996, to the police department and the practices and policy of the police department concerning the preservation of such tapes. Recognizing that the tapes were missing, the jury was fully exposed to evidence that fairly presented the two directly opposing scenarios for it to resolve as the trier of fact. The second *Asherman* factor must be resolved in favor of the state.

"In balancing the third *Asherman* factor, 'the reason for the unavailability of the evidence, our cases have focused on the motives behind the destruction of the evidence.' *State* v. *Leroux*, [18 Conn. App. 223, 231, 557 A.2d 1271, cert. denied, 212 Conn. 809, 564 A.2d 1072

---

[24] There is no evidence in the record that anyone ever in fact knew what was on the missing tapes.

(1989)]." *State* v. *Morales*, 39 Conn. App. 617, 626, 667 A.2d 68, cert. denied, 235 Conn. 938, 668 A.2d 376 (1995). In considering such motives, "our courts have considered such factors as whether the destruction was deliberate and intentional rather than negligent . . . or done . . . with reckless disregard . . . or calculated to hinder the defendant's defense, out of other animus or improper motive, or in reckless disregard of the defendant's rights. . . . *State* v. *Grillo*, 23 Conn. App. 50, 56, 578 A.2d 677 (1990)." (Internal quotation marks omitted.) *State* v. *Morales*, supra, 626–27. The failure to preserve the tapes was not shown to be due to any of the above reasons. The evidence does justify a jury finding that the probable reason that the tapes were missing was due to inadvertence[25] on the part of the police department after the state had notified it of the trial court's order to preserve them. These circumstances weigh heavily against the defendant's claim that the loss or destruction was actually "intentional." This *Asherman* factor weighs in favor of the state.

Finally, in applying the fourth *Asherman* factor, we must consider the prejudice to the defendant caused by the unavailability of the tapes. The defendant claims that the tapes would have impeached Lewis' testimony, especially as to the telephone calls of April 27, 1996, and the location of his car. The missing tapes did not, however, preclude him from substantial progress in accomplishing that purpose. We refer to his broad cross-examination, his production of police department members in his case who not only testified at length concerning their investigation and policy on receiving reports of "stolen" cars but who also produced reports

---

[25] The defendant's witness, Sergeant Arthur Maglicri, the person in charge of preserving such tapes, testified that the "loss" was probably due to inadvertence. We note that our Supreme Court has held that where tapes in the possession of police were "inadvertently lost through carelessness" it was not viewed as having been done in bad faith. See *State* v. *Palmer*, 206 Conn. 40, 59, 536 A.2d 936 (1988).

that became exhibits. The defendant, however, does not at all develop Gudealm's testimony, who was in fact with Lewis when he parked his car on Farmington Avenue and so testified. Significantly, the defendant did not attempt to have her testimony stricken. Her testimony added telling strength to the state's case. Contrary to his assertion that because "his conviction rested on Lewis' testimony," his suggestion that if the tapes were accessible to him at trial that a different result might have occurred and that he was prejudiced, must be rejected.

The balancing test required by *Asherman* leads us to conclude that the defendant's state constitutional due process rights were not violated by the police department's failure to preserve the tapes in question. We need not explore, on the tapes issue, the formation by the trial court of a remedy "that vindicates his . . . rights"[26] as those rights were not violated. See *State* v. *Morales*, supra, 232 Conn. 729.

---

[26] After the trial court refused to enter a judgment of acquittal on all charges as the defendant requested, the defendant filed his request to charge No. 10 ("Destruction of Evidence") asking in relevant part that the court instruct the jury that it was "to treat the following facts as being *conclusively established*:

"1. That the Hartford police department was notified by an employee of Walnut Street Services, Inc., at 1:31 a.m. on April 27, 1996, that Walnut Street Services, Inc., had towed what turned out to be . . . Lewis' car from a private parking lot in front of the Mechanic's Savings Bank at 204 Farmington Avenue in Hartford.

"2. That at 2:40 a.m. on the same day . . . Lewis called to notify the police that his car had been stolen from the street in front of 100 Washington Street in Hartford.

"3. At 1:07 p.m. on the same day . . . Lewis reported that his car was stolen from the street on Farmington Avenue. This was the first report that the car was stolen from the street in front of 210 Farmington Avenue and was made after . . . Lewis had already recovered his car from Walnut Street Services, Inc."

The trial court properly refused to give this instruction. Not only is it decidedly one-sided, but it is also improper as containing argumentative factual claims. See *State* v. *Vennard*, 159 Conn. 385, 399, 270 A.2d 837, cert. denied, 400 U.S. 1011, 91 S. Ct. 576, 27 L. Ed. 2d 625 (1971). It also eliminates one of the crucial factual disputes in the case: From where was the Lewis

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.

car towed? In that regard, it has the effect of canceling out unchallenged testimony of Gudealm that the defendant never moved to strike. It was an improper request to charge and was properly refused.